370 F.2d 633
 ASSOCIATED ENGINEERS, INC., a Montana Corporation, Appellant,
v.
Dallas JOB, Grand Electric Cooperative, Inc., a Corporation, and Troy Cannon Construction Company, Inc., a Kansas Corporation, Appellees.
GRAND ELECTRIC COOPERATIVE, INC., a Corporation, Appellant,
v.
Dallas JOB, Troy Cannon Construction Company, Inc., a Kansas Corporation, and Associated Engineers, Inc., a Montana Corporation, Appellees.
TROY CANNON CONSTRUCTION COMPANY, Inc., a Kansas Corporation, Appellant,
v.
Dallas JOB, Grand Electric Cooperative, Inc., a Corporation, and Associated Engineers, Inc., a Montana Corporation, Appellees.
 Nos. 18140-18142.
 United States Court of Appeals Eighth Circuit.
 December 19, 1966.
 Rehearing Denied February 21, 1967.
 
 COPYRIGHT MATERIAL OMITTED Donald J. Porter, of Martens, Goldsmith, May & Porter, Pierre, S. D., for Associated Engineers, Inc.
 Chas. H. Whiting, of Whiting, Lynn, Freiberg & Shultz, Rapid City, S. D., for Grand Electric Cooperative, Inc.
 William G. Porter, of Costello, Porter, Hill, Banks & Nelson, Rapid City, S. D., for Troy Cannon Const. Co., Inc.
 Joseph M. Butler, of Bangs, McCullen, Butler & Foye, Rapid City, S. D., for Dallas Job, and filed brief with Thomas E. Simmons, Rapid City, S. D., and also Thompson, Lundberg & Nodland, Bismarck, N. D.
 Before VOGEL, Chief Judge, BLACKMUN, Circuit Judge, and STEPHENSON, District Judge.
 BLACKMUN, Circuit Judge.
 
 
 1
 These appeals present rather intricate questions of negligence and indemnity.
 
 
 2
 The plaintiff, Dallas Job, was seriously injured on February 9, 1962, when he sustained an electrical shock while engaged in line work near Stoneville, South Dakota. He has been awarded a judgment for $200,000 against Grand Electric Cooperative, Inc., Associated Engineers, Inc., and Troy Cannon Construction Company, Inc. The judgment provides, however, (a) that, as among themselves, Associated, Troy and Grand "each shall not be obligated in an amount in excess of $66,666.66; (b) that Troy's liability to the plaintiff "is limited to the sum of $66,666.66"; and (c) that Troy is to be credited with the workmen's compensation payments it has made. Grand, Troy, and Associated take their separate appeals.
 
 
 3
 The plaintiff's injury was incurred in the course of his employment with Troy. He has received from Troy compensation benefits prescribed by the South Dakota Workmen's Compensation Act, S.D.Code, Title 64 (1939), as amended. Troy was the contractor for the construction of additions to electric power lines owned by Grand. Associated was the engineering firm retained by Grand to design and supervise the construction. Thus Grand was the owner, Associated the engineer, Troy the contractor, and plaintiff the employee of Troy.
 
 
 4
 The plaintiff was precluded by the State's Workmen's Compensation Act, S.D.Code §§ 64.0103 and 64.0104 (1939), from suing his employer Troy for his injury. He instituted this diversity negligence action against Grand and, by later amendment, against Associated. Grand brought Troy into the litigation by a third-party complaint for indemnity for any amount Grand might be required to pay the plaintiff. In addition, Grand claimed indemnity from Associated, Associated cross-claimed against both Grand and Troy, and Troy counter-claimed for the compensation payments it made to Job.[1] Each defendant also denied negligence on its part and alleged assumption of risk by the plaintiff and contributory negligence on his part.
 
 
 5
 The case was tried to a jury upon special verdicts submitted pursuant to Rule 49(a), Fed.R.Civ.P. The jury found that each of the three defendants was negligent; that the negligence of each was a proximate cause of the plaintiff's injury; that the plaintiff was contributorily negligent; that, however, his contributory negligence was "slight and that of the defendants, or either of them gross";[2] that the plaintiff did not assume the risk of his injury; and that he was entitled to an award of $200,000.
 
 
 6
 The parties stipulated that the court was to determine all fact and legal issues relating to indemnity. Accordingly, the court found, in agreement with the jury, that each of the three defendants was negligent in various respects, "that each of the Defendants was one-third negligent, and that the negligence of each of them contributed one-third to Job's injury". It further found that Troy, by its construction contract with Grand, had obligated itself to hold Grand harmless "for injuries to persons happening by reason of any negligence by Troy". It found and concluded that, despite the presence of the State's workmen's compensation law (by virtue of which "Grand and Associated would not be entitled to recover contribution from Troy as a joint tort feasor"), Troy and Grand intended "at the very least that Troy should indemnify Grand to the extent [one-third] that Troy's negligence contributed to the injury". The other indemnity claims (except that of Troy for the recovery of its compensation payments) were disallowed.
 
 
 7
 Thus, plaintiff Job was given a direct judgment against Troy "to the extent of Troy's indemnity obligation", the court feeling that this "will do no substantial prejudice to any of the parties". The effect of the judgment, however, was to divide the benefit of any indemnity liability on the part of Troy equally between Grand and Associated.
 
 
 8
 On these appeals Grand and Troy do not deny negligence on their respective parts. Associated contends that it owed no affirmative duty to the plaintiff to protect him from injury and that the plaintiff was not injured by any act on its part. All three argue that, as a matter of law, the plaintiff's contributory negligence precludes recovery. Associated and Troy made similar contentions with respect to assumption of risk. Associated argues that the court erred in denying its claim of indemnity against Grand. Grand contends that the court correctly sustained its indemnity claim against Troy. Grand and Troy agree, however, that if Grand is entitled to anything from Troy, it is complete indemnification for the amount which Grand may be required to pay the plaintiff. There are complaints as to various aspects of the court's instructions. The sufficiency of the interrogatories to sustain the judgment is also questioned. There is no attack upon Job's judgment so far as its amount is concerned.
 
 
 9
 The evidence. In 1961 Grand agreed with the United States Air Force to provide electrical service to Minuteman missile sites in South Dakota. This necessitated both the installation of new poles by Grand and the addition of new lines on existing poles. It is the latter, known as "conversion work", with which we are here concerned. The project was financed through a loan obtained by Grand from the Rural Electrification Administration.
 
 
 10
 Construction began in late October. The conversion work consisted of adding an 8-foot cross-arm and two braces to each existing pole and of attaching a new line at each end of the cross-arm. The poles already carried a high voltage hot line at their top and a neutral line about three feet below their top. The new cross-arm was placed midway between these two existing lines. The construction contract provided that work was to be done on the poles "with the lines deenergized". In recognition of the needs of consumers, however, the contract contemplated that the lines should remain energized when this did not interfere with the work. It was provided that lines might be deenergized at Troy's request from 8:30 to 11:00 a. m., and from 1:30 to 4:30 p. m., Monday through Friday. Troy was directed to schedule its work accordingly. However, it was also provided that Troy would notify Grand when to deenergize, specifying the desired lines, and also notify Grand "in writing or in such other manner as the circumstances permit" when the lines could be reenergized safely each day. Grand itself was to deenergize and reenergize.
 
 
 11
 The construction contract did not specify any procedure for notifying the various Troy employees to stop work in anticipation of reenergization. At times, however, as many as four crews were spread along the line over a distance as great as seven miles. However, the precise time of reenergization varied somewhat from day to day. The usual procedure was for Leach, Troy's superintendent, to drive along the line and advise each employee who had pole climbing duties that reenergization was imminent and to stay off the poles. He would then tell Grand's switchman that the line was clear and could be reenergized.
 
 
 12
 At the time of the accident the plaintiff was 28 years of age. Most of his life had been spent on his family's North Dakota farm. He had an eighth grade education and some training and a diploma in diesel engine work. He had served nearly two years in the armed forces as a truck driver. His work experience had been primarily on the farm but he had engaged in some mechanical work, including the repair of automobiles and tractors.
 
 
 13
 In the latter part of 1961 the plaintiff received word indirectly from a cousin, Larry Job, "who was working on lines", that employees were needed at Faith, South Dakota. He went there, spoke with Larry and with Troy superintendent Leach, and was hired without being questioned as to his experience in electrical construction. He started early in November, worked on the ground for a time and then climbed poles. He once suffered a "skittish" feeling while climbing.
 
 
 14
 The accident occurred on a pole about three and a half miles west of the switching point at Stoneville. The plaintiff began work that morning with ground duties. He then strung wire. This entailed climbing and laying wire over the cross-arms. He continued this work after lunch, moving to the west. Toward the end of the afternoon he reached a point about a half mile west of the scene of the accident. There he met James Wahl who had been working ahead of him laying on the ground the wire which the plaintiff was hanging on the cross-arms. Neither the plaintiff nor Wahl had a watch. Wahl testified that he did not know what time it was. The plaintiff did not testify as to the time but he did say that it seemed to him "like it was getting kind of late in the afternoon as far as quitting time".
 
 
 15
 The plaintiff and Wahl got into a pickup truck and drove east past the scene of the accident and to the top of a hill a short distance beyond. There is disagreement as to what happened immediately before and during this drive. Wahl testified that while proceeding east in the truck he and the plaintiff encountered Kopren, a Grand lineman, who was driving west, and that Kopren stopped and said something to the effect that it was getting close to quitting or reenergizing time. The plaintiff, on the other hand, testified that he knew Kopren but that he did not recall having spoken with him or even having seen him on the day of the accident. Kopren had still another version. He testified that he was driving west and came upon plaintiff and Wahl standing in a ditch "about a pole west" of the accident scene, that he yelled to them, "The line is going to be hot", and that the plaintiff replied "I know it, [Leach] already told me".
 
 
 16
 There are also conflicts in the testimony with respect to the warning allegedly given the plaintiff by Leach. Leach testified that while driving along the road he came upon the plaintiff and Wahl; that he left his car, walked over to the plaintiff, and told him that the power would be turned on in about five minutes and that he was not to climb any more poles; that the plaintiff wondered whether he had time to hang the wire from one more pole; that he, Leach, replied, "Well, you probably would have time, but — just forget about it, just throw it over the fence". Charles Russell, an employee who was riding with Leach, testified that this conversation occurred a pole and a half west of the accident scene. Departing from Leach's version, however, he said that Wahl was not present and that Leach had ended the conversation by authorizing the plaintiff to climb one more pole ("That one pole, and no more"). Robert Bierer indicated that Leach had warned the plaintiff and others but was somewhat uncertain in his testimony. The plaintiff and Wahl both denied that Leach warned them of reenergization at any time on the afternoon of the accident.
 
 
 17
 In any event, the plaintiff and Wahl reached the top of the hill. There they encountered Larry Job and Clarence Roberts, another Troy employee. They got out of the truck and began working. Larry spliced a wire. Since Larry was not wearing climbing hooks the plaintiff went up the pole and hung the wire although he "figured it might be close to quitting time". The plaintiff observed other workmen climbing poles to the east while he was hanging this wire.
 
 
 18
 The four employees then drove west to the point at which the accident occurred. Larry continued to splice. He told the plaintiff to climb a pole and throw down a wire so that he could splice it. The plaintiff testified that he asked Larry, "Well, what if they haven't cleared the line? What if it's hot?" and that Larry replied, "They couldn't, they hadn't cleared the line for him". Both Wahl and Larry corroborated the substance of this conversation. Roberts, who was hard of hearing, testified that he heard no conversation at all between the plaintiff and Larry prior to the plaintiff's ascent. Evidently the line was reenergized while the plaintiff was on the pole for he testified that the first time he touched the top wire it was cold.
 
 
 19
 General rules. Inasmuch as the accident occurred in South Dakota, the substantive law of that state governs this diversity action. Billingsley v. Westrac Co., 365 F.2d 619, 621 (8 Cir. 1966); Knapp v. Styer, 280 F.2d 384, 386 (8 Cir. 1960). So far as the sufficiency of the evidence is concerned, the parties, as is often the case, make no suggestion as to any difference between the federal test thereof and the South Dakota test. See Schultz & Lindsay Constr. Co. v. Erickson, 352 F.2d 425, 429-430 (8 Cir. 1965), and Ozark Air Lines, Inc. v. Larimer, 352 F.2d 9, 11 (8 Cir. 1965). We perceive no significant difference, for both Schultz and Ozark and recent South Dakota cases demand that the supporting evidence be competent and substantial. Vander Vorste v. Northwestern Nat'l Bank, S.D., 138 N.W.2d 411, 414 (1965); Warwick v. Mulvey, 80 S.D. 511, 127 N.W.2d 433, 435 (1964); Bentz v. Cimarron Ins. Co., 79 S.D. 510, 114 N.W.2d 96, 97 (1962).
 
 
 20
 And in considering the sufficiency of the evidence to sustain the judgment on the present issues of contributory negligence and assumption of risk we must bear in mind that the jury found that the plaintiff did not assume the risk of his injury and that he was guilty of contributory negligence which was no more than "slight", and that every conflict in the evidence, or in the inferences which might reasonably be drawn therefrom, is to be resolved in favor of these findings. Ozark Air Lines, Inc. v. Larimer, supra, p. 11 of 352 F.2d; Knapp v. Styer, supra, p. 386 of 280 F.2d; Coca Cola Bottling Co. v. Hubbard, 203 F.2d 859, 860 (8 Cir. 1953); Vander Vorste v. Northwestern Nat'l Bank, supra, p. 414 of 138 N.W.2d; Bentz v. Cimarron Ins. Co., supra, p. 97 of 114 N.W.2d
 
 
 21
 Assumption of risk. The South Dakota cases call for the customary two elements in the proof of assumption of risk. First, the plaintiff must have knowledge of the existence of the risk and an appreciation of its character. It is not enough that he negligently fail to discover the risk's presence. Second, he must voluntarily accept the risk in the sense that what he does is not compelled by tortious conduct of the defendant. This implies the availability of sufficient time to reflect and enough experience and knowledge to make an intelligent choice. Bartlett v. Gregg, 77 S.D. 406, 92 N.W.2d 654, 657 (1958); Schmeling v. Jorgensen, 77 S.D. 8, 84 N.W.2d 558, 566 (1957); Christiansen v. Fantle Bros., 56 S.D. 350, 228 N.W. 407, 408 (1929); Clinkscales v. Wisconsin Granite Co., 38 S.D. 205, 160 N.W. 843, 845 (1916); Perreault v. Wisconsin Granite Co., 32 S.D. 275, 144 N.W. 110, 113 (1913). See Restatement (Second), Torts §§ 496D and 496E (1965). The burden of proof as to this defense is, of course, on the defendant who asserts it. Perreault v. Wisconsin Granite Co., supra, p. 113 of 144 N.W.
 
 
 22
 In the light of these principles we cannot hold that, as a matter of law, this plaintiff assumed the risk of his injury. We recognize there was evidence to the effect that the plaintiff knew that the time to cease pole work was approaching and that, when reenergized, the lines would have enough power to kill. In view of its determination that Job was contributorily negligent, the jury may well have found that he possessed such knowledge. This, however, does not require us to conclude that he so comprehended the risk and the danger incident to his conduct as to take the issue from the jury. The plaintiff did not possess a watch and did not know the exact time. Neither did his co-worker Wahl. Other men were still working. Reenergization did not always occur precisely at the scheduled time. And there was testimony as to a custom of warning the men prior to reenergization.
 
 
 23
 There was, to be sure, some evidence that the plaintiff was warned by both Leach and Kopren. The plaintiff, however, flatly denied this and, as to Leach, the plaintiff's denial was corroborated by Wahl. Larry Job testified that he had not been warned by Leach. There are also obvious inconsistencies in the testimony about the details of these warnings and as to whether Leach gave plaintiff permission to climb one more pole. The import of all these inconsistencies and the selection of which testimony to accept were clearly for the jury.
 
 
 24
 Comparative negligence. The South Dakota comparative negligence statute originally enacted as Session Laws of 1941, ch. 160, § 1, is identical with and was patterned after the older Nebraska statute which is now Neb.Rev.Stat. § 25-1151 (1964 Reissue). See Friese v. Gulbrandson, 69 S.D. 179, 8 N.W.2d 438, 441 (1943). This court has encountered the statute on a number of occasions. See Audiss v. Peter Kiewit Sons Co., 190 F. 2d 238, 241-243 (8 Cir. 1951); Hale v. Montana-Dakota Util. Co., 192 F.2d 274, 279 (8 Cir. 1951); Chicago & N.W. Ry. Co. v. Bork, 223 F.2d 652, 655-656 (8 Cir. 1955); Knapp v. Styer, supra, pp. 388-390 of 280 F.2d.
 
 
 25
 The South Dakota court has said, "[I]t is presumed that the intention of the legislature is reflected by [the statute's] previous construction" by the Nebraska courts and that the legislature "has not sought to uproot the doctrine of contributory negligence as it exists in our law" but "to benefit only a particular class of plaintiffs in negligence cases, and that a very limited class". Friese v. Gulbrandson, supra, pp. 441-442 of 8 N.W.2d. Apparently, however, there has been a divergence over the years in the construction of the identical statute in the two states on one point material to this case. The Nebraska court seems to hold that the character of the plaintiff's negligence is not to be determined on an absolute basis but is to be tested only with that of the defendant, that is, in order for the plaintiff to recover, his negligence must be slight only as measured with the defendant's negligence. Roby v. Auker, 151 Neb. 421, 37 N.W.2d 799, 800-801 (1949); Andelt v. Seward County, 157 Neb. 527, 60 N.W.2d 604, 606 (1953); Brackman v. Brackman, 169 Neb. 650, 100 N.W.2d 774, 778 (1960); Sayers v. Witte, 171 Neb. 750, 107 N.W.2d 676, 680 (1961). See, also, our own cases of Union Pac. R. Co. v. Denver-Chicago Trucking Co., 202 F.2d 31, 35 (8 Cir. 1953); Continental Can Co. v. Horton, 250 F.2d 637, 644 (8 Cir. 1957); United States v. Bohachevsky, 324 F.2d 120, 124 (8 Cir. 1963); Hutchinson v. Fouts, 349 F.2d 946, 951 (8 Cir. 1965). Compare, however, the seemingly inconsistent language in Pierson v. Jensen, 150 Neb. 86, 33 N. W.2d 462, 467 (1948), where it is said that a plaintiff may not recover where his negligence "in itself was more than slight".
 
 
 26
 The South Dakota court, on the other hand, has interpreted the statute as calling for two measurements, namely, the determination of the plaintiff's own negligence on an absolute basis and then the comparison of the plaintiff's negligence with that of the defendant. Thus, in order to sustain a recovery, the plaintiff's negligence must be slight according to an absolute scale and, as well, the defendant's negligence must be gross in comparison with the plaintiff's. Friese v. Gulbrandson, supra, pp. 442-443 of 8 N.W.2d; Will v. Marquette, 73 S.D. 192, 40 N.W.2d 396, 397 (1949), where the court relies on the apparently aberrant comments in Pierson v. Jensen, supra; Roberts v. Brown, 72 S.D. 479, 36 N.W. 2d 665, 667 (1949); Creager v. Al's Constr. Co., 75 S.D. 482, 68 N.W.2d 484, 486-487 (1955); Dwyer v. Christensen, 76 S.D. 201, 75 N.W.2d 650, 653, 56 A.L. R.2d 734 (1956). But see Judge Sickel's special concurrence in Roberts v. Brown, supra, pp. 668-669 of 36 N.W.2d. Moreover, although the statute provides that "all questions of negligence and contributory negligence shall be for the jury", the South Dakota court has held that the trial court must direct a verdict for the defendant if reasonable minds would agree that the plaintiff's negligence is more than slight. Flanagan v. Slattery, 74 S.D. 92, 49 N.W.2d 27, 29 (1951); Ries v. Daffin Corp., S.D., 131 N.W.2d 577, 579 (1964).[3]
 
 
 27
 In order to decide here whether the plaintiff's contributory negligence as a matter of law was more than slight, it is necessary to have a standard by which to measure the concept of slight negligence and then to apply it to the evidence in this case. In the first decision under its comparative negligence statute the South Dakota court said that slight negligence does not refer simply to an absence of "extraordinary care", but that it describes "a quantum of want of such ordinary care as a reasonable man would exercise under the circumstances". Friese v. Gulbrandson, supra, p. 442 of 8 N.W.2d. The court, however, in that opinion and subsequently, has complained both of what it regards as intrinsic uncertainty in the legislative concept of slight negligence and of the inherent difficulty of defining it. It has indicated that each case must be determined upon its facts and that "no exact rule or standard * * * can be fixed for its application". Roberts v. Brown, supra, p. 667 of 36 N.W.2d; Judge Rudolph dissenting in Flanagan v. Slattery, p. 32 of 49 N.W. 2d; Pleinis v. Wilson Storage & Transfer Co., 75 S.D. 397, 66 N.W.2d 68, 71 (1954). We, too, have noted this difficulty. Audiss v. Peter Kiewit Sons Co., supra, p. 242 of 190 F.2d. We endeavor only to extract from the cases some significant guidelines for our use here.
 
 
 28
 The cases in which the quality of the plaintiff's contributory negligence has been found to raise an issue for the factfinder, rather than to be more than slight as a matter of law, for the most part are those in which one of several forms of mitigating circumstances presents itself. For example, in two collision cases, where the plaintiffs made lefthand turns after looking and signaling, or slowing down, the issue was for the jury. Roberts v. Brown, supra, p. 668 of 36 N.W.2d; Barnhart v. Ahlers, 79 S.D. 186, 110 N.W.2d 125, 127-128 (1961). In a third case, where the plaintiff failed to look or signal before turning, recovery was barred as a matter of law. Flanagan v. Slattery, supra, pp. 30-32 of 49 N.W. 2d. Thus, the taking of some safety precaution, however inadequate it proved to be to prevent the accident, appears to have significance. Another contrast is suggested by comparing a case in which the plaintiff, while negligently driving at night "beyond his lights", hit an unlighted vehicle stalled in his lane the presence of which he had no reason to anticipate (held to be a jury issue), Dwyer v. Christensen, supra, p. 654 of 75 N.W.2d, with two cases in which the plaintiff was either warned or possessed knowledge of the existence and approximate location of a threat to his safety (held not to be a jury issue). Creager v. Al's Constr. Co., supra, p. 488 of 68 N.W.2d; Carlson v. Radloff, 76 S.D. 324, 77 N.W.2d 919 (1956). See Ford v. Robinson, 76 S.D. 457, 80 N.W.2d 471, 473 (1957); Ries v. Daffin Corp., supra, pp. 579-580 of 131 N.W.2d; Hale v. Montana-Dakota Util. Co., supra, p. 278 of 192 F.2d. In these cases the critical factor seems to be knowledge. More was required of the plaintiff who was aware of his danger.
 
 
 29
 The court also seems willing to consider the foreseeability of injury in determining the quality of contributory negligence. In each of three cases, for example, the plaintiff was aware of the presence of the automobile which injured him but under the circumstances was held entitled to anticipate up to a point that the driver would avoid injury by taking precautions or simply by obeying the law. Will v. Marquette, supra, pp. 398-399 of 40 N.W.2d; Winburn v. Vander Vorst, 74 S.D. 531, 55 N.W.2d 609, 613 (1952); Roth v. Jelden, 80 S.D. 40, 118 N.W.2d 20, 25 (1962). On the other hand, the plaintiff who enters an intersection without reducing speed or making observations required by law, or who illegally attempts to pass in an intersection, or who parks a vehicle on a dark and slippery highway without taking adequate precaution to warn approaching motorists, is held to be guilty of more than slight contributory negligence as a matter of law. Friese v. Gulbrandson, supra, p. 443 of 8 N.W.2d; Kundert v. B. F. Goodrich Co., 70 S.D. 464, 18 N.W.2d 786 (1945); Pleinis v. Wilson Storage & Transfer Co., supra, p. 71 of 66 N.W.2d; Schuknecht v. Chicago, M. St. P. & P. R.R. Co., 74 S.D. 61, 48 N.W.2d 917 (1951); Wooley v. Chicago & N.W. Ry. Co., 74 S.D. 203, 50 N.W.2d 644 (1951); Grob v. Hahn, 80 S.D. 271, 122 N.W.2d 460 (1963); Haase v. Willers Truck Serv., 72 S.D. 353, 34 N.W.2d 313, 316-317 (1948).
 
 
 30
 From these cases we conclude that three factors may properly be considered in appraising the quality of a plaintiff's negligence: the precautions he took for his own safety; the extent to which he should have comprehended the risk as the result of warnings, experience, or other factors; and the foreseeability of injury as a consequence of his conduct. These factors of course may overlap in a given case, for a plaintiff may increase the foreseeability of injury by failing to take safety precautions and greater precautions may be expected if he is aware of danger.
 
 
 31
 In the light of this analysis and viewing the evidence most favorably to the plaintiff Job, we conclude that he was not more than slightly negligent as a matter of law. He had had no experience on electric power lines prior to his employment by Troy. Nevertheless, he knew that they were potentially dangerous. He was accustomed to receiving a warning before reenergization. He knew that the end of the working day was close at hand but no one had warned him of impending reenergization. He had no watch. The time of reenergization varied from day to day. When he mentioned the possibility of danger to Larry Job immediately before climbing the pole on which he received his injury, he was reassured.
 
 
 32
 The factor as to the precaution which one may be expected to take for his own safety will naturally depend upon the nature and magnitude of the risk to which he knows or ought to know he is exposed. But here again, although he suspected that reenergization was imminent, he had been reassured when he voiced his concern, it would have been of little help for him to have carried a watch and he had observed the work force spread out along the lines. He might have regarded it as both impracticable and superfluous to seek out Leach or a representative of Grand for advice.
 
 
 33
 We conclude that the record in this case does riot contain enough of the elements upon which the South Dakota court has relied when it holds plaintiffs guilty of more than slight contributory negligence as a matter of law.
 
 
 34
 It is perhaps proper to consider at this point an issue raised by Associated and Troy with respect to the sufficiency of the seventh and ninth interrogatories put to the jury.[4] These had to do with the comparative negligence issue. It is urged essentially that the jury was asked only whether any one of the three defendants was guilty of gross negligence and was allowed to predicate an award of damages upon an affirmative answer to that general question. The jury thus did not indicate that all of the defendants were guilty of gross negligence or, if not, which ones were and which were not. Associated and Troy seem to suggest that a new trial is necessary in order to remedy this defect. The plaintiff does not deny the defect but argues that if it exists, it was not preserved for appeal by timely objection.
 
 
 35
 It is perhaps fairly apparent that the interrogatories as given were inadequate. The error may have been compounded by the court's instruction to the jury that slight contributory negligence would not bar recovery if the negligence "of Grand, Troy, and the Associated [was] gross in comparison". However, Troy neither recognized nor suggested a solution to this problem in its proposed interrogatories or in its proposed jury instructions. Neither Grand nor Associated did so in their respective proposed jury instructions. Although all three defendants made various objections to the court's instructions and interrogatories, none included this point.
 
 
 36
 In the submission of the case to a jury on special verdicts each party waives trial by jury of any issue of fact which the court fails to submit, unless its submission is demanded before the jury retires. Rule 49(a), Fed.R.Civ.P. As to an issue which is so waived, "the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict". This rule finds ready application here. Delta Engineering Corp. v. Scott, 322 F.2d 11, 17 (5 Cir. 1963), cert. denied 377 U.S. 905, 84 S.Ct. 1164, 12 L.Ed.2d 176. The trial judge made no specific finding on the issue but he did find that each defendant was one-third negligent and one-third responsible for the plaintiff's injuries. His entry of judgment against Associated and Grand implies a finding that each was grossly negligent in comparison. The rule requires that we deem such a finding to have been made. Furthermore, the characterization of Troy's negligence for purposes of the comparative negligence statute is immaterial for Troy's liability here, if it exists at all, arises from an obligation to indemnify Grand.
 
 
 37
 Since Grand does not deny negligence on its part, since Grand's attack on the plaintiff's judgment rests solely on the issues of assumption of risk and comparative negligence, and since we now have decided both those issues in the plaintiff's favor, the plaintiff's judgment insofar as it is against Grand must be affirmed.
 
 
 38
 Duties owed the plaintiff. All concede that Grand warned Leach, who was Troy's job supervisor, of the impending energization. Troy contends that Grand by this warning satisfied any duty which it owed the plaintiff because the notice to Leach "was notice to Job". Associated suggests that Leach's knowledge is imputable to the Troy employees so as to bar plaintiff's recovery from any defendant. Gulf Oil Corp. v. Bivins, 276 F.2d 753 (5 Cir. 1960), cert. denied 364 U.S. 835, 81 S.Ct. 70, 5 L.Ed.2d 61, is perhaps typical of the authorities advanced as supporting this approach by Troy and Associated. But these authorities stand only for the proposition that the owner satisfies his duty to warn the contractor's employees of latent dangers by notifying their supervisors; the employees did not contend that any duty owed them could not have been discharged by a warning. See p. 757 of 276 F.2d.
 
 
 39
 The present case, however, involves a good deal more than a failure to warn. Plaintiff Job also alleged negligence on the part of Grand or Associated, or both of them, in hiring an independent contractor with inexperienced personnel; in permitting that contractor to remain on the job; in failing to require that it rectify its allegedly unsafe procedures; and in energizing when it should have been aware of the unsafe procedures adopted by the contractor to clear the line. These allegations were reflected in the instructions to the jury and incorporated in the court's own negligence findings. The duties which they imply go far beyond an obligation to warn limited to notification to the contractor's job supervisor.
 
 
 40
 Associated, furthermore, argues that it owed no duty at all to concern itself with the plaintiff's safety. Here, broadly stated, the issue is whether Associated agreed to supervise the construction to the extent of overseeing and regulating energization procedures, safety practices, and work-crew competence. Such an undertaking concededly is a prerequisite to its liability here. Associated does not deny its liability to the plaintiff if it was contractually bound to supervise in this sense and if it negligently failed to perform this duty.
 
 
 41
 The Associated-Grand agreement is an REA form entitled "Engineering Service Contract". The engineer, Associated, agrees to "render diligently and competently all engineering services which shall be necessary or advisable for the expeditious, economical, and sound design and construction of the Project", and, as the owner's "representative", assumes "sole responsibility for the direction and supervision of the Contractor in the construction of the Project". It is stated that the enumeration of specific duties and obligations to be performed by the engineer "shall not be construed to limit [its] general undertakings". In that part of the contract entitled "Supervision and Inspection", the engineer reiterates its agreement to supervise the construction of the project and to "make diligent effort to insure the * * * construction * * * in accordance with the terms of the Construction contract". Among other things, it is to inspect materials prior to their incorporation into the project and to supervise "the manner of the incorporation" of those materials "and the workmanship with which such materials shall be incorporated". It is to maintain at the site during the entire period of the construction a "competent resident engineer, with full authority to act".
 
 
 42
 The construction contract referred to is the Grand-Troy agreement. It, too, is an REA form and is entitled "Electric System Construction Contract". That portion thereof which is entitled "Supervision and Inspection" provides that the bidder, Troy, agrees to provide "constant supervision by a competent superintendent"; to employ "capable, experienced and reliable foremen and such skilled workmen as may be required"; and to be bound by the directions of the engineer. The owner reserves the right to require the removal of any employee of the bidder, if necessary "in the judgment of the Engineer", in order to protect the owner's interest, and the engineer may require the bidder "to increase the number of its employees and to increase or change the amount or kind of tools and equipment if at any time the progress of the work shall be unsatisfactory to the Engineer". The construction and all materials and equipment used therein are subject to the inspection of the engineer. The latter is authorized to suspend the work wholly or in part for such period as it deems necessary because of unsuitable weather "or such other conditions as are considered unfavorable for the satisfactory prosecution of the work or because of the failure of the Bidder to comply with any of the provisions of the Contract". All decisions of the engineer are binding upon the owner, except that no decision may be construed to relieve the bidder of its contractual obligations.
 
 
 43
 Another part of this contract requires the bidder generally to "take all reasonable precautions for the safety of employees on the work and of the public", and to comply with all applicable safety laws and building and construction codes. Specifically, it prohibits the bidder from causing or permitting any employee "to perform any work upon energized lines or upon poles carrying energized lines" in the absence of explicit authorization to the contrary. Further, it authorizes the bidder, in the event of a violation and the receipt of written notice thereof, to "correct" the violation.
 
 
 44
 The trial court found that Associated was responsible to Grand "for the total design and construction and had the right to control the manner, method, and detail of the construction project including the energization of the line", and that it failed to discharge this responsibility in not insisting that Troy adhere to reasonable safety precautions when it knew or should have known that Troy was not doing so, and in allowing Troy to use incompetent and inexperienced personnel when it knew or ought to have been aware of this deficiency.
 
 
 45
 Associated makes a number of points in arguing that its contract did not impose a duty on its part to control the "manner, method, and detail" of the construction work. The contractor would find Associated's interference with his direction and control over his employees and work methods to be "intolerable"; supervision and inspection having nothing to do with the end product would not benefit the owner; to impose such a burden would convert every supervising engineer into a safety engineer and require him to charge accordingly; it would require the engineer to protect the contractor's employee from the contractor's own negligence; it would be "absurd" in the present case to hold the engineer, who received only one-twelfth the contractor's compensation, responsible for the "details" of the work; Grand did not intend that Associated render services as a safety engineer since "Grand had its own REA safety instructor"; Grand did not request Associated to perform any safety functions, Associated did not believe its function was to teach or supervise safety practices and did not do this on this project, and Leach believed that safety practices were his job; Associated did not represent the owner with respect to energization, for the contract spells out a procedure for handling it directly between Grand and Troy; liability may be imposed only upon one who negligently fails to perform a duty to warn the plaintiff but Associated did not assume such a duty and Grand never intended that it do so; Associated was in no position to assure that the plaintiff received a warning since it did not itself receive advance notice of energization and its representative frequently was not in the area where Troy's crews were working and did not know all the Troy employees or their work assignments; Associated agreed to render services only in connection with the design and construction of the project and not in relation to aspects of Grand's "private business" such as the energization and deenergization of the line; and Associated may not be held responsible for Troy's failure to use the "grounds-in-sight" safety practice since Grand had expressly confirmed its "exclusive control" of all "switching and grounding" of the lines in letters to Grand and Troy about ten days before the accident.
 
 
 46
 We do not underestimate the difficulty and perhaps the closeness of this issue. The contract language is not so clear as it might be. Perhaps it would have been helpful had the record contained evidence of the manner in which these REA form contracts in the past have been construed by these and other parties. In the absence of evidence of that kind, we are reduced to linguistic analysis with some assistance from cases construing similar agreements.
 
 
 47
 We feel that the engineer, Associated, in agreeing to supervise the construction of the project, undertook more than an obligation to assure that the end product conformed to specifications. It was to see that construction was "expeditious and economical"; it was to supervise the "manner" in which materials were incorporated; it was to determine whether the owner's interest required that any employee of the contractor be removed; it could require the contractor to effect changes in the number of employees and in the number or kind of tools and equipment; and the "manner of construction" of the project was subject to its "inspection, tests and approval". Particularly pertinent are provisions relative to "constant supervision" by a "competent superintendent"; to the employment of "capable, experienced and reliable foremen" and "skilled workmen"; to the taking of "all reasonable" safety precautions; and to refraining from causing employees to work on energized lines or on poles carrying such lines. At the same time, Associated was authorized to suspend the work in whole or in part in the event Troy failed to comply with any provisions of the contract and to require the contractor to "correct" violations of the section prescribing reasonable safety precautions.
 
 
 48
 Each of these provisions imposes upon the engineer an obligation to do more than assure conformity to specifications. Taken in their totality they suggest that, at least in the judgment of those who drafted the contract, it would not be "intolerable" to subject the manner and method of the contractor's work to the supervision of the engineer in at least certain respects. Neither is it likely that the broadened supervisory duties suggested by this interpretation would not benefit the owner. Presumably, it would tend to avoid litigation of the very kind presently before us. We are not, as Associated suggests, converting every supervising engineer into a safety engineer as a matter of law. We are simply construing a contract. We note in passing that Grand did not retain its own REA safety instructor in any sense which would render a provision requiring Associated to supervise Troy's safety procedures surplusage. The record shows only that a state employee conducted monthly safety classes for the employees of Grand.
 
 
 49
 It is true that representatives of Associated testified that Grand never directed or asked them to supervise Troy's safety practices; that they did not undertake to enforce safety procedures; and that they did not consider this to be among their duties. Troy's superintendent Leach testified that safety procedures were part of his job. We feel, however, that evidence that a party failed to perform an act or that it was not requested to do so or that it did not believe itself bound so to do, will not suffice to avoid liability in this case. The situation might be different if Associated had proved the existence of a trade usage which limited the scope of its duty and did not conflict with the manifest intention of the parties. See 5 Williston, Contracts, §§ 651, 656 (3d ed. 1961). This it failed to do.[5]
 
 
 50
 A number of Associated's arguments hinge on the absence of any contractual provision specifically obligating it to warn Troy's employees of impending energization, the fact that it was not its practice to convey such warnings, and the unfeasibility of doing so. The short answer to these assertions is that the plaintiff does not seek to impose liability on a theory that Associated failed to warn. He relies, instead, on Associated's alleged failure to take action which would have either increased the likelihood that Troy employees would be warned, or avoided injury even if they were not. Associated also argues that energization of the lines is not an aspect of the "construction" which it agreed to supervise but is, instead, a part of the already existing "private business" of Grand necessitated by its desire to continue to serve existing customers. It is clear as a practical matter, however, that deenergization and reenergization were essential incidents to the construction project. This was the only way Grand could continue to serve its customers on a parttime basis while the construction project was under way. Finally, Associated says that Grand had "expressly confirmed" its own "exclusive control" of "switching and grounding" shortly before the accident. This may be true. It appears from context, however, that Grand's action in this respect was designed to prevent other persons from exposing themselves to danger by undertaking to deenergize the lines and ground them at the point of disconnect. We think that Associated's status as Grand's representative and its authority to bind Grand in exercising its supervisory and inspection functions were sufficient to require that it demand the use of appropriate procedures reasonably necessary to assure the safety of the Troy employees, regardless of Grand's attitude.
 
 
 51
 We find substantial support for the construction we place upon these contracts in Erhart v. Hummonds, 232 Ark. 133, 334 S.W.2d 869 (1960), the factual background of which is discussed in Fidelity & Cas. Co. v. J. A. Jones Constr. Co., 200 F.Supp. 264 (E.D.Ark.1961), and in this court's opinion on appeal in that case, 325 F.2d 605 (8 Cir. 1963). See, also, Miller v. De Witt, 59 Ill.App.2d 38, 208 N.E.2d 249 (1965), appeal pending, and C. & L. Rural Elec. Co-op. Corp. v. McEntire, 216 Ark. 276, 225 S.W.2d 941, 945-946 (1949).
 
 
 52
 Several of the cases cited by Associated reach apparently contrary results. In some instances this is attributable simply to a narrow reading of language which imposes supervisory duties in broad terms. See, for example, Clinton v. Boehm, 139 App.Div. 73, 124 N.Y.S. 789 (1910); Garden City Floral Co. v. Hunt, 126 Mont. 537, 255 P.2d 352 (1953); Humpton v. Unterkircher, 97 Iowa 509, 66 N.W. 776 (1896). In one such case where the engineer was expressly vested with authority over the contractor's safety procedures, the court held that this clause related only to measures designed to protect the public, as opposed to the contractor's employees. Ramos v. Shumavon, 21 A.D.2d 4, 247 N.Y.S.2d 699, 703 (1964), aff'd 15 N.Y.2d 610, 255 N.Y.S.2d 658, 203 N.E.2d 912 (1964). Other cases concern contractual provisions more narrowly written than those before us, for example, those in which the architect's or engineer's duties are tied closely to insuring conformity to plans and specifications, Olsen v. Chase Manhattan Bank, 9 N.Y.2d 829, 215 N.Y.S.2d 773, 175 N.E.2d 350 (1961), affirming 10 A.D.2d 539, 205 N.Y.S.2d 60 (1960); Day v. National United States Radiator Corp., 241 La. 288, 128 So.2d 660 (1961); Wetteland v. Reyna Constr. Co., 42 Misc. 2d 991, 249 N.Y.S.2d 593 (Sup.Ct. 1963), or to consultation and review of plans, Thomas v. Fromherz Eng'rs, 159 So.2d 612 (La.App.1963), writ refused 245 La. 799, 161 So.2d 276 (1964). These cases, however, do not persuade us that Associated is to be absolved of responsibility under its contractual obligations here or that the trial court's view of the South Dakota law on this issue was erroneous.
 
 
 53
 It follows, from all this, that the plaintiff's judgment insofar as it is against Associated must also be affirmed.
 
 
 54
 Associated's claim for indemnity from Grand. The source of Associated's duty to the plaintiff, as we have noted, was clearly contractual. The source of Grand's duty to him is perhaps more difficult to isolate. The trial court instructed the jury that the plaintiff's claim against Grand was predicated on the theory that Grand "as it entered on the construction * * * became engaged in an ultra-hazardous activity requiring the exercising of a high degree of care, commensurate with the hazards involved, one it could not delegate to anyone". This suggests the possibility that Grand's liability, if any, was vicarious, that is, that it would be based upon breach by an agent of a non-delegable duty rather than upon Grand's personal fault. See Restatement (Second), Torts §§ 416, 427 (1965). The court went on, however, to indicate that a showing of negligence on Grand's part was essential to recovery. Moreover, it later found that Grand was negligent in specified respects. It therefore seems clear that Grand's liability to the plaintiff was in fact premised on its own breach of duty. Clearly, it was obliged to exercise ordinary care to render its premises reasonably safe for invitees. Anderson v. Chicago & N.W. Ry. Co., 59 S.D. 543, 241 N.W. 516, 518 (1932); Norris v. Chicago, M. St. P. & P. R.R. Co., 74 S.D. 271, 51 N.W.2d 792, 793 (1952). Also, it was probably under a duty to see that Troy took special precautions to avoid the "peculiar unreasonable risk of physical harm" arising out of the work to be performed. See Restatement (Second), Torts § 413 (1965).
 
 
 55
 Without further articulating the nature of the underlying duties, the trial court found in substance that both Grand and Associated were negligent in permitting Troy to continue the work without a sufficient number of competent personnel and without adequate procedures for clearing the lines in anticipation of reenergization; that Grand had negligently reenergized on the occasion of the plaintiff's injury in that it knew or should have been aware of the unsafe procedures employed by Troy; that Associated had designed the system of reenergization and deenergization used by Troy and Grand; and that the system was unsafe.
 
 
 56
 Associated argues in support of its claim for indemnity that Grand's negligence was "primary, active and affirmative", in contrast to its own which was merely "passive and secondary"; that Associated at the most was guilty of acts of omission, none of which could have caused injury without the affirmative act of Grand in reenergizing the line; that Grand, unlike Associated, had a duty to warn the plaintiff and made the decision to energize; that Grand was in "active control" of the instrumentality which caused the injury and was aware of the existence of danger from the moment of energization; and that an invitor-invitee relationship existed between Grand and the plaintiff while "no special relationship nor any contractual relations" existed between Associated and the plaintiff.
 
 
 57
 We note, initially, that the trial court did not find that Grand was obligated to warn the plaintiff personally that the line was about to be energized. The contract did not require it and we are not prepared to say that ordinary care did. The contract did require that Grand clear energization with a representative of the contractor. It did this when Leach was warned. We note further that we have already held against Associated's implication on this branch of the case that it owed no duty to the plaintiff. Associated's position, therefore, seems to come down to the proposition that its negligence lay only in the failure to discover or prevent misconduct by Grand, which controlled and actively accomplished energization and consequently had actual knowledge of its occurrence.
 
 
 58
 It is manifest, however, that Grand's negligence did not lie in energizing the line at an inappropriate moment, that is, acting without consulting Troy or being aware or put on notice that a Troy employee was still in the lines. The findings against Grand, instead, were based on its failure to compel Troy to employ competent personnel and reasonable safety procedures or, in the alternative, to halt work. Upon this view of the facts, Grand's negligence is hardly attributable to "affirmative" or "active" conduct on its part. Moreover, Associated's negligence involves the same omissions as does that of Grand.[6] This is not a case in which Associated's liability arises out of vicarious responsibility for Grand's negligence, or in which Grand rendered Associated liable by inducing it to act wrongfully, or in which Associated's negligence lies simply in a failure to discover and remedy the wrongful conduct of Grand. Thus, it is hard to say that Grand's liability is "primary" in relation to that of Associated. For present purposes, the two were subject to identical duties and the liability of each arises from its failure to discharge those duties. Under these circumstances, Associated is not entitled to indemnification. Fidelity & Cas. Co. v. J. A. Jones Constr. Co. supra, p. 611 of 325 F.2d; Chicago, R.I. & P. R.R. Co. v. Chicago & N.W. Ry. Co., 280 F.2d 110, 114 (8 Cir. 1960), cert. denied 364 U.S. 931, 81 S.Ct. 378, 5 L.Ed.2d 364. Compare Chicago G.W. Ry. Co. v. Casura, 234 F.2d 441, 449-450 (8 Cir. 1956); Millard v. Baker, 76 S.D. 529, 81 N.W.2d 892 (1957). See Hendrickson v. Minnesota Power & Light Co., 258 Minn. 368, 104 N.W.2d 843 (1960); Prosser, Torts, § 48, pp. 278-81 (3d ed. 1964). We so hold.
 
 
 59
 We therefore affirm the trial court's dismissal of Associated's cross-claim against Grand.
 
 
 60
 Grand's claim for indemnity from Troy. The Grand-Troy construction contract contained the following indemnity provision:
 
 
 61
 "The Bidder [Troy] shall hold the Owner [Grand] harmless from any and all claims for injuries to persons or for damage to property happening by reason of any negligence on the part of the Bidder or any of the Bidder's agents or employees during the control by the Bidder of the Project or any part thereof."
 
 
 62
 As we have noted, the trial court construed this provision as requiring "at the very least" that Troy indemnify Grand "to the extent that Troy's negligence contributed to the injury". Since the court also found that the negligence of each of the three defendants contributed one-third to the injury, judgment was entered against all three in the amount of $200,000, but Troy's obligation was limited to one-third of that amount with credit for workmen's compensation payments made to the plaintiff.
 
 
 63
 On appeal Grand defends the trial court's determination that the contract entitles it to indemnity from Troy but argues that it is entitled to such indemnification for the entire amount it is required to pay the plaintiff and that the trial court erroneously permitted Associated to share the benefit of the indemnity. Troy in its brief and Associated at oral argument concede that the trial court erred in measuring Troy's liability by the relative magnitude of its negligence rather than by the amount of Grand's liability, and in allowing Associated to benefit from Troy's indemnity obligation. We agree. The trial court's allocation of liability is inconsistent with the theory of indemnity and is not warranted by the terms of the hold harmless agreement.[7] Accordingly, judgment should have been entered (1) for the plaintiff and against Grand and Associated, jointly and severally, in the amount of $200,000; (2) conditioned upon plaintiff's collection of that judgment in sufficient amount, for Troy and against the plaintiff for the workmen's compensation benefits paid the plaintiff by Troy, less the necessary and reasonable expense incurred by the plaintiff in collecting such compensation (S.D.Code § 64.0301 (1939), as amended by Session Laws of 1964, ch. 224); and (3) (assuming that Troy is liable to Grand under their agreement, an issue which we next discuss), for Grand and against Troy in the amount of any and all payments which Grand may be required to make to the plaintiff.
 
 
 64
 Troy argues, however, that it is not liable under its hold harmless agreement with Grand because the jury and the trial court found that Grand's negligence contributed to the plaintiff's injury and the agreement does not provide for indemnification against the consequences of Grand's own negligence.
 
 
 65
 The applicable standard for the construction of indemnity agreements has been the subject of much judicial inquiry. The South Dakota Supreme Court has said that, at least in the context of a construction contract and as between a contractor and a subcontractor, indemnity agreements are to be "strictly construed in favor of a subcontractor as against the contractor"; that unless the language clearly shows an intention to indemnify, "courts do not read into a written contract indemnity provisions not expressly set forth therein"; that such "contracts are subject to close scrutiny as to whether such intent was present"; and that, on the other hand, where the subcontractor expressly agrees to indemnify the contractor, "he is bound by the terms of his contract". Schull Constr. Co. v. Koenig, 80 S.D. 224, 121 N.W.2d 559, 562 (1963). In an earlier case, the South Dakota court stated that a contract of this kind "must be given that construction which will most nearly carry out the intention of the parties". Moriarty v. Tomlinson, 58 S.D. 431, 235 N.W. 363, 364 (1931).
 
 
 66
 It is to be noted that in Schull the court was not concerned with the construction of an indemnity agreement but with the question whether an indemnity provision in a primary contract had been incorporated in a subcontract by reference. Although the language used in Schull may have been more extreme than was necessary to justify the court's negative response to that question, it but echoes statements contained in decisions of this and other courts relating to the construction of indemnity agreements where the indemnitee asserts a right to recover for loss occasioned at least in part by his own negligence. See, for example, Ocean Acc. & Guar. Corp. v. Jansen, 203 F.2d 682, 685 (8 Cir. 1953) (requiring that the intention to afford a right of recovery in such circumstances be "clearly and unequivocally" expressed); Anthony v. Louisiana & Ark. Ry. Co., 316 F.2d 858, 863-864 (8 Cir. 1963), cert. denied 375 U.S. 830, 84 S.Ct. 74, 11 L.Ed. 2d 61 (contract must clearly and definitely, although not expressly, show intention to indemnify against particular loss); Farmbest, Inc. v. Martin, 353 F.2d 278, 280 (8 Cir. 1965) ("clear expression of intent"); Fidelity & Cas. Co. v. J. A. Jones Constr. Co., supra, pp. 607 and 609 of 325 F.2d (same); Whirlpool Corp. v. Morse, 222 F.Supp. 645, 658 (D. Minn.1963), aff'd 332 F.2d 901 (8 Cir. 1964) ("fairly plain language" necessary to recover where indemnitee is more than passively negligent); Southern Pac. Co. v. Morrison-Knudsen Co., 216 Or. 398, 338 P.2d 665, 671 (1959) ("clearly and unequivocally"); Thompson-Starrett Co. v. Otis Elevator Co., 271 N.Y. 36, 2 N.E.2d 35, 37 (1936) ("unequivocal terms"); Employers Mut. Liab. Ins. Co. v. Griffin Constr. Co., 280 S.W.2d 179, 182, 53 A.L.R.2d 967 (Ky.1955) (where contract was substantially identical to that here involved, intent must be expressed in "unequivocal terms" and will be found only if "no other meaning can be ascribed to it"); Patent Scaffolding Co. v. Standard Oil Co., 68 Ill.App.2d 29, 215 N.E.2d 1, 5, 7 (1966) (clear and explicit, but not necessarily express, language); General Acc. Fire & Life Assur. Corp. v. Finegan & Burgess, Inc., 351 F. 2d 168, 172 (6 Cir. 1965) ("plain" or "clear and unvarnished" language).
 
 
 67
 We believe, however, that judicial references of this kind to "clear" or "definite" or "unequivocal" language mean no more than that doubts, if any, raised in the course of construing the contract are to be resolved in favor of the indemnitor.[8] Griffiths v. Henry Broderick, Inc., 27 Wash.2d 901, 182 P.2d 18, 19, 175 A.L.R. 1 (1947). The South Dakota court itself has indicated that the language need not be express. And it seems clear that the precise scope of any contractual language may not be determined without reference to the circumstances surrounding the execution of the contract including the situation and evident objectives of the parties. See 4 Williston, Contracts, § 609 (3d ed. 1961); Stern v. Larocca, 49 N.J.Super. 496, 140 A.2d 403, 406 (App.Div.1958).
 
 
 68
 With all this in mind, we conclude the hold harmless clause does confer upon Grand the right to complete indemnification in this case. In reaching this result we find the following factors of particular significance:
 
 
 69
 1. The agreement is that Grand shall be held harmless from "any negligence on the part of" Troy or its agents. This use of the word "any" clearly commands a broad coverage in terms of the nature of the underlying claim and the quality and magnitude of the indemnitor's own negligence. We feel it also contemplates coverage notwithstanding that factors other than the indemnitor's negligence concur in producing injury; the contract is not restricted to claims produced by the indemnitor's negligence unaccompanied by other causative elements. Compare Northern Natural Gas Co. v. Roth Packing Co., 323 F.2d 922, 926 (8 Cir. 1963), and Booth-Kelly Lumber Co. v. Southern Pac. Co., 183 F.2d 902, 907, 20 A.L.R.2d 695 (9 Cir. 1950), with Farmbest, Inc. v. Martin, supra, pp. 280-281 of 353 F.2d.
 
 
 70
 2. Troy suggests that an inference may be drawn as to the parties' intentions from other provisions of their contract relating to Troy's obligations for damage done to the property of Grand or of third parties, or to the project itself during construction. It is true that in certain situations these provisions impose liability only upon Troy for damage caused by its fault and that in others they do so without regard to Troy's fault. None of them, however, refer specifically to concurrent fault on the part of Grand or to its effect on the liability of Troy. Consequently, we believe that a similar omission from the clause under consideration here does not suggest one answer or the other to the question before us.
 
 
 71
 3. This is not a case in which a negligent indemnitee seeks to hold responsible a non-negligent indemnitor. Many of the adjudicated cases have to do with that situation. They arise out of contracts providing in broad terms, for example, that the indemnitor shall be liable for all claims "growing out of the execution of the work". See Thompson-Starrett Co. v. Otis Elevator Co., supra, p. 36 of 2 N.E. 2d. Courts are understandably reluctant to allow a negligent indemnitee to invoke general language of this type in order to recover from a faultless indemnitor. See 175 A.L.R. 8, 32-34 (1948).
 
 
 72
 4. It seems unlikely that the parties intended to deprive Grand of quasi-contractual indemnity rights which it would have enjoyed in the absence of contract; yet this is precisely the result which would follow were we to construe the contract as precluding indemnification on the facts of this case. As has been noted, neither Grand nor Troy on this appeal disputes its own negligence. Under the instructions and the evidence the jury could have found that Troy was negligent in failing to warn the plaintiff of energization, in failing to use grounds-in-sight regularly, and in maintaining an inadequate staff of competent workmen. Grand's negligence lay in its failure to require that Troy remedy the latter two deficiencies. In other words, Grand's liability hinges on its failure to exercise reasonable care in policing the negligent conduct of Troy. Assuming that it did not "acquiesce" in Troy's negligent practices, it would have been entitled to quasi-contractual indemnity in the absence of a contrary contractual provision. Restatement, Restitution, § 95 (1937); Prosser, Torts, § 48, pp. 278-81 (3d ed. 1964). We find nothing in this contract to suggest that the parties intended to abrogate Grand's common law right to indemnity. Compare Booth-Kelly Lumber Co. v. Southern Pac. Co., supra, p. 910 of 183 F.2d; Southern Pac. Co. v. Morrison-Knudsen Co., supra, p. 674 of 338 P.2d.
 
 
 73
 5. A construction which would not permit indemnity would render the hold harmless clause without meaning or significance. The clause's presence indicates that the parties meant Grand to have something by it which it would not have without it.
 
 
 74
 For these reasons we hold that, at a minimum, the contract authorizes indemnification on the facts here. It is not necessary for us to determine whether Grand could recover if the character of its negligence were such as to preclude indemnification under quasi-contractual principles. It may well have been that the parties intended to protect the owner against liability arising vicariously, or from the failure to inspect and remedy the unreasonable practices of its contractor and no more. Compare Mayer v. Fairlawn Jewish Center, 38 N.J. 549, 186 A.2d 274, 280-281, 97 A.L.R.2d 604 (1962).
 
 
 75
 Instructions and interrogatories. Associated raises several objections about the trial court's instructions to the jury. Troy complains generally about the trial court's interrogatories and about the court's failure to submit interrogatories which Troy proposed. Nearly all these objections and complaints center in issues which have been discussed and decided above adversely to these appellants. They require no additional comment here. Furthermore, we have carefully reviewed each of the challenged instructions and interrogatories and each of the requested interrogatories and find no error in the trial court's actions with respect to them.
 
 
 76
 Summary. Plaintiff Job is entitled to judgment for $200,000 against Grand and Associated jointly and severally; conditioned upon sufficient collection by the plaintiff of that judgment, Troy is entitled to judgment against plaintiff Job for the workmen's compensation benefits it has paid to Job, less the amount, if any, of Job's necessary and reasonable expenses of collecting those benefits; and Grand is entitled to judgment against Troy for what Grand pays to satisfy Job's judgment against Grand. If the situation is such that Grand and Associated share the burden of the Job judgment equally, then, when all is done, the plaintiff Job receives the sum of $200,000, less his net compensation benefits then already paid; Associated pays $100,000 of this amount; Troy pays the remaining $100,000 less the net compensation benefits already received by Job; and Grand pays nothing net.
 
 
 77
 The judgment of the trial court is vacated. The case is remanded for further proceedings to the extent, if any, such are indicated, and for the entry of a new judgment consistent with the conclusions herein expressed.
 
 
 
 Notes:
 
 
 [1]
 On its appeal, Associated now expressly disavows its cross-claim against Troy. Grand, although making no express statement one way or the other, also on its appeal does not appear really to press its claim against Associated
 
 
 [2]
 The South Dakota comparative negligence statute, S.D.Code § 47.0304-1 (Supp. 1960), reads:
 "In all actions brought to recover damages for injuries to a person or to his property caused by the negligence of another, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery when the contributory negligence of the plaintiff was slight and the negligence of the defendant was gross in comparison but the contributory negligence of the plaintiff shall be considered by the jury in the mitigation of damages in proportion to the amount of contributory negligence attributable to the plaintiff; and all questions of negligence and contributory negligence shall be for the jury."
 
 
 [3]
 We are not to be understood as suggesting that a federal court applying South Dakota law would necessarily be bound by a provision of that law which purports to preclude the federal court from directing a verdict. See Herron v. Southern Pac. Co., 283 U.S. 91, 51 S.Ct. 383, 75 L.Ed. 857 (1931); Byrd v. Blue Ridge Rural Elec. Coop., 356 U.S. 525, 538, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958)
 
 
 [7]
 
 
 
 [4]
 Was the plaintiff Dallas Job guilty of contributory negligence? If your answer is yes, was such negligence on his part slight and that of the defendants, or either of them gross?
 
 
 [9]
 
 If you have found negligence on the part of the defendants, or of two, or either of them and such negligence to have been a proximate cause of the injuries and loss to the plaintiff, and if you also have found the plaintiff free from contributory negligence or his negligence slight and that of the defendants or either of them gross, and if you also have found that the plaintiff did not assume the risks incident to the climbing of the pole, then what sum of money do you award him as compensation under all of the rules I have laid down? This sum will be the amount of your verdict.
 
 
 [5]
 There is even some evidence in plaintiff's Exhibits 6 and 9 that Grand and Associated felt that Associated had a function to perform in supervising various aspects of the construction activity which were not related solely to the quality of the end product but to matters such as switching operations and the quality of Associated's supervision
 
 
 [6]
 As has been noted, the trial court found that Associated had designed the energization system used by Grand and Troy. Associated contends that this finding is not supported by the evidence. Grand does not appear to defend the finding and we have difficulty finding support for it in the record. What evidence there is indicates that the energization procedure was part of the REA construction contract form that Associated was required to obtain for use on this project. In resolving this indemnity issue, we assume this finding to be erroneous and place no reliance upon it
 
 
 [7]
 But compare C & L Rural Elec. Co-op. Corp. v. Kincaid, 221 Ark. 450, 256 S.W. 2d 337, 341 (1953), where the court construed an apparently identical hold harmless agreement as permitting an apportionment of damages between indemnitor and indemnitee based upon relative fault. The subsequent apportionment was sustained in Kincaid v. C & L Rural Elec. Co-op. Corp. 227 Ark. 321, 299 S.W.2d 67 (1957). These decisions seem to be regarded, however, as reflecting an Arkansas rule applicable to all indemnity agreements rather than an interpretation of the particular agreement then before the court. See Williams v. Midland Constructors, 221 F.Supp. 400, 403-404 (E.D. Ark.1963). In any event, these Arkansas cases do not appear to be representative of general authority and we do not regard them as indicative of South Dakota law
 
 
 [8]
 Troy contends that ambiguities in the contract ought to be resolved against Grand because Grand prepared the contract and is responsible for any ambiguity or lack of clarity which it contains, citing Evans v. Heaton, 57 S.D. 436, 233 N. W. 281, 282 (1930). The difficulty with this is that Grand did not prepare the contract. It was an REA form. Moreover, it does not appear that Grand, which financed the construction with an REA loan, was free to choose whether or not to use the REA form