Jack Ralph HESLEP et ux v. FORREST AND COTTON, INC. and GARVER AND GARVER, INC.

5-5046 .449 S. W. 2d 181

Opinion delivered January 26, 1970

*McMath, Leatherman, Woods & Youngdahl,* for appellants.

*Wright, Lindsey & Jennings,* for appellees.

J. Fred Jones, Justice. Jack R. Heslep was employed as an oiler, driver and hookup man on a mobile

crane belonging to his employer, Paul N. Howard Co. A fellow employee, Eddy Faulkner, was the crane operator. As Heslep started to attach a steel cable line from the crane boom to a joint of sewer pipe under an electric power line, the crane line became energized from the overhead power line and Heslep was injured. He filed suit for personal injuries against Forrest and Cotton, Inc. and Garver and Garver, Inc., the consulting and resident engineers. A jury trial resulted in a verdict in favor of Heslep for $7,500. The trial court granted a motion by the engineers for judgment notwithstanding the verdict and Heslep has appealed. He relies on the following point for reversal:

"The trial court erred in directing a judgment for defendants notwithstanding the jury verdict."

Heslep states that the sole issue in this case is whether or not there was substantial evidence from which the jury could find that the engineers owed a duty to require the contractor to provide safety devices on the mobile crane in question while it was being operated in close proximity to 13,000 volt power lines. We are of the opinion that there was no substantial evidence from which the jury could find that the engineers owed such duty under the facts and circumstances of this case.

Heslep's employer, Paul N. Howard Co., had a general contract with the City of Little Rock to install a new underground sewer system. The system was to be installed according to plans and specifications prepared by the out of state engineering firm, Forrest and Cotton, Inc. The local firm, Garver and Garver, Inc., was employed as resident engineers to see that the plans and specifications were complied with as the work progressed. One section of the sewer system was constructed of joints of pipe five feet long and three feet in diameter which were lowered into a ditch and cemented into place under the center of North Street. The joints of sewer pipe were shipped in from out of state and de-

livered to the job site by truck. The pipe joints were inspected for cracks and flaws upon delivery at the job site, and all rejected joints were returned to the manufacturer as the trucks made return trips for additional pipe.

On the day of Heslep's injury, a truck had delivered a load of pipe and was ready to leave on the return trip about noon. There were two rejected joints of pipe to be returned on the truck, and by the use of a front end loader they had been moved out of the way and placed together near the intersection of North and Ringo Streets. They were placed on the ground between the sidewalk and street curb, which was also about 30 feet beneath an electric power line strung on light poles also set between the sidewalk and curb. The truck on which the joints of pipe were to be returned was too high for the pipe to be placed on the truck by the front end loader, so the front end loader was used to move the rejected pipe joints from under the power line and out into the street where they could then be picked up by the mobile crane and lifted onto the truck.

The operator of the crane was Eddy Faulkner, who was also an employee of Paul N. Howard Co. It was his duty to actually operate the crane boom and it was Heslep's duty to drive the crane from place to place and spot it as directed by Faulkner. Heslep would then fasten the cable from the crane boom to the object to be moved, and would release the cable from the object after it had been moved. It was also Heslep's duty to keep the crane oiled and greased. On the day of Heslep's injury he and Faulkner had been ordered by their foreman, R. L. Webb, to move the crane to the intersection of Ringo and North Streets and hoist the rejected joints of pipe onto the truck to be hauled away. The crane was moved into position for this purpose about 12:30. The crane was equipped with either a 50 foot boom, as testified by Webb, or a 70 foot boom, as testified by Faulkner, and the joints of pipe were lifted by

means of a swing cable attached to the joints of pipe and also to the lift cable on the crane.

One joint of the rejected pipe had been moved from under the power line into the street by the front end loader when the operator of the front end loader went to lunch, leaving one rejected joint of pipe in the street to be hoisted onto the truck and leaving the other joint still under the power line and still to be removed by the front end loader. When Heslep and Faulkner arrived with the crane, they loaded the joint of pipe from the street onto the truck. The truck was ready to leave as soon as the other rejected joint of pipe was loaded, so Heslep and Faulkner did not wait for the operator of the front end loader to return from lunch and remove the additional joint of pipe from under the power line, but instead, after loading the first joint onto the truck, Heslep pulled or carried the swing cable, which was still attached to the lift cable on the crane boom, over to the remaining joint of reject pipe under the power line. As he was attempting to fasten the sling cable to the joint of pipe, the lift cable, or boom, came in contact with the overhead power line and Heslep was injured.

The contractual arrangements between the parties are lengthy and will not be set out here. Some of the provisions on which Mr. Heslep seems to rely, and as read into the record by Engineer Van Meter, are as follows:

"Paragraph SC. 15, entitled 'Public Utilities and Other Property to be Changed. In case it is necessary to change or move the property of any owner or of a public utility, such property shall not be moved or interfered with until ordered to do so by the Engineer. The right is reserved to the owner of public utilities to enter upon the limits of the project for the purpose of making such changes or repairs of their property that may be made necessary by performance of this Contract.'

\* \* \*

This is General Conditions, Paragraph 2.11, 'Defects and Their Remedies. It is further agreed that if the work or any part thereof, or any material brought on the site of the work for use in the work or selected for the same, shall be deemed by the Engineer as unsuitable or not in conformity with the specifications, the Contractor shall, after receipt of written notice thereof from the Engineer, forthwith remove such material and rebuild or otherwise remedy such work so that it shall be in full accordance with this contract.'

\* \* \*

Paragraph 2.04, 'Contractor's Duty and Superintendence. The Contractor shall give personal attention to the faithful proscecution and completion of this contract and shall keep on the work, during its progress, a competent superintendent and any necessary assistants, all satisfactory to the Engineer. The superintendent shall represent the Contractor in his absence and all directions given to him shall be as binding as if given to the Contractor. Important directions shall be confirmed in writing to the Contractor. Other directions shall be so confirmed on written request in each case.'

\* \* \*

'Protection Against Accident to Employees and the Public. The Contractor shall take out and procure a policy or policies of workmen's compensation insurance with an insurance company licensed to transact business in the State of Arkansas, which policy shall comply with the Workmen's Compensation Law of the State of Arkansas. The Contractor shall at all times exercise reasonable precautions for the safety of employees and others on or near the work and shall comply with all applicable provisions of Federal, State, and Municipal safety laws

and building and construction codes. All machinery and equipment and other physical hazards shall be guarded in accordance with the 'Manual of Accident Prevention in Construction' of the Associated General Contractors of America except where incompatible with Federal, State or Municipal laws or regulations. The Contractor shall provide such machinery guards, safe walkways, ladders, bridges, gangplanks and other safety devices as may be required by the Engineer as requisite to the prevention of accident. . .' "

The appellant quotes Ark. Stat. Ann. § 81-1406 (Supp. 1967) as follows:

"The operation . . . of any . . . machinery or equipment . . . capable of vertical, lateral, or swinging motion . . . by or near overhead high voltage lines, shall be prohibited, if at any time during such operation . . . it is possible to bring such equipment . . . within six feet (6 ft.) of such overhead voltage lines, except where such high voltage lines have been effectively guarded against danger from accidental contact, by either: (1) The erection of mechanical barriers to prevent physical contact with high voltage conductors; or (2) De-energizing the high voltage conductors and grounding where necessary. Only in the case of either of such exceptions may the six foot (6 ft.) clearance required be reduced . . ."

The appellant then argues that there was a requirement under the conditions prevailing in this case that prior to the removal of the pipes in question the 13,000 volt power line under which they were located should have been de-energized; that the contractor's Agreement with the Owner, which was prepared by the engineers, provided that in case it is necessary to change or move the property of any owner or of a public utility, such property shall not be moved or interfered with un-

til ordered to do so by the engineer; that at no time did the engineers, with full knowledge of what was taking place direct that the 13,000 volt power line under which appellant was working be de-energized. We are not impressed by this argument, and we are of the opinion that the trial court did not err in granting the motion for a judgment notwithstanding the verdict.

Heslep's argument actually comes down to a contention that he was injured as a proximate result of the engineers' negligence in permitting the use of the crane without requiring the prime contractor to insulate the boom and cable against the transmission of electricity from overhead electric wires and in failing to de-energize the electric wires in this case before permitting Heslep to attempt the removal of the pipe from under the power line. This contention is not sustained by the terms of the contracts nor by the facts in this case.

The evidence of what happened is clear in this case. Heslep's employer used a mobile crane in lifting heavy objects out in the street. A front end loader was used to move heavy objects under, or out from under, overhead power lines. When Heslep was injured, he and his fellow employee Faulkner, simply undertook to take a joint of a sewer pipe from under a power line by using a crane rather than waiting for the front end loader.

The engineers' rights and powers are not to be confused with their obligations and duties under their contracts. Without attempting to set out the rights, powers, obligations and duties the engineers *do have* under their contract, we shorten this opinion by simply holding that they *do not have* the right, power, obligation or the duty to supervise Heslep or his fellow employees in the performance of their duties. If Heslep's employer was in violation of any of the safety code provisions as to the nature or use of equipment, he should account to the proper authorities under the provisions of the code. The engineers who designed and specified the materials to

be used in the construction of the sewer and who assumed the responsibility of seeing that the sewer conformed to the plans and specifications, were not charged with the duty of enforcing the code and were not charged with negligence as a matter of law in the employer's failure to comply with the code.

Heslep argues that the engineers in the case at bar had the same degree of control over the sewer project as the architects had in *Erhart* v. *Hummonds*, 232 Ark. 133, 334 S. W. 2d 869. We do not agree. The two cases are distinguishable on the contractual relationship as well as the facts. In *Erhart* we said:

> "The contract provides that the general contractor 'shall erect such protection as may be required, or as directed by the architect, maintain same, and maintain any existing protections, all in accordance with the governing laws, rules, regulations and ordinances.' And, further, the 'contractor shall do all shoring necessary to maintain the banks of excavations, to prevent sloughing or caving, and to protect workmen.' The contract further provides: The architect 'shall have general supervision and direction of the work—. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the contract.' It was a question for the jury as to whether the architect was negligent in failing to stop all work until the shoring on the east wall was made safe for the workmen."

In *Erhart* an excavation for a building caved in and killed some people. The excavation walls were vertical, required shoring up, and this was improperly done. The architects were charged with the responsibility of seeing that this was properly done and were charged with the responsibility of stopping the work until it was properly done.

In the case at bar the engineers were not charged with the responsibility of supervising the safe removal of sewer pipe from under power lines. As a matter of fact the contract did not provide for the placing of sewer pipe under power transmission lines or for the removal of pipe from under transmission lines at all. Mr. Heslep attempts to distinguish the case at bar from *Walker* v. *Wittenberg*, 241 Ark. 525, 412 S. W. 2d 621, by stating that in the case at bar the engineers were vested with authority to stop the work in order to insure compliance with the provisions of the contract— again the answer is that the contracts did not provide for, or require, the placing or removal of objects under power lines.

The judgment is affirmed.