567 P.2d 388 (1977)
Cecil S. SLIFER, Plaintiff-Appellant,
v.
WHEELER & LEWIS, Defendant-Appellee.
No. 75-921.
Colorado Court of Appeals, Div. III.
May 5, 1977.
Rehearing Denied May 26, 1977.
Certiorari Granted August 2, 1977.
*389 Fischer & Wilmarth, Elery Wilmarth, G. William Beardslee, Fort Collins, for plaintiff-appellant.
*390 Ellison, deMarino & Knapp, Margaret Bates Ellison, Denver, for defendant-appellee.
SMITH, Judge.
Plaintiff, Cecil Slifer, commenced this action against defendant, Wheeler & Lewis, an architectural firm, (the Architect), to recover damages for injuries sustained as a result of a building construction accident. The jury returned a verdict for Slifer in the amount of $105,000, but the trial court entered a judgment in favor of the Architect, notwithstanding the verdict. Slifer appeals. We reverse and remand with instructions to reinstate the jury verdict.
Slifer's complaint alleged that the Architect was negligent in both the design and supervision of construction of the high school building in Ft. Collins where plaintiff was working when the injury occurred, and that this negligence proximately caused his injury. At trial, there was no evidence of either negligence in design of the building or of contributory negligence on the part of Slifer. Thus, the sole ultimate issue tried related to the Architect's allegedly negligent supervision of construction.
Slifer was a welder-carpenter who with a co-worker, Woodward, was welding the connective plates which attached the roof beams to the upright columns which had been erected to support the roof of the building. They were so engaged when the section of the roof upon which they were working collapsed. Slifer received severe crushing injuries to the heels of both feet, resulting in intense pain and permanent impairment of his ability to walk.
The evidence disclosed that in 1969, the Poudre Valley School District # R-1 had entered into a contract with Wheeler & Lewis, the Architect, which firm specialized in design and supervision of school buildings. The Architect agreed to furnish all architectural, engineering, and "supervisory services" required in connection with construction of several schools in the Fort Collins area, one of which was the new high school where Slifer was injured. G.E. Johnson Construction Company was general contractor for construction of the building, pursuant to a contract it entered into with the school district, and in that contract it agreed to do all the work in a substantial and workmanlike manner and in strict conformity with all plans. The general contractor then sub-contracted out the fabrication and erection of all structural members to Rocky Mountain Prestress, Inc., for whom Slifer worked. Rocky Mountain Prestress agreed in its contract to provide "shop drawings" showing all of the erection procedures including shoring and bracing detail, and the sequence of installing such bracing and shoring.
The specific issue now before this court is whether the trial court erred in granting defendant's motion for judgment notwithstanding the jury's verdict. In evaluating an N.O.V. motion, the trial court must view the evidence in the light most favorable to supporting the verdict of the jury, and in attempting to justify the verdict, it must apply in favor of the verdict every reasonable inference that can legitimately be drawn from the evidence. Brent v. Bank of Aurora, 132 Colo. 577, 291 P.2d 391; Eberle v. Hungerford, 130 Colo. 167, 274 P.2d 93. Therefore, a jury's verdict may be set aside and a motion for judgment notwithstanding such verdict may only be granted if the evidence is such that reasonable men could not from the evidence, reach the same conclusion as did the jury, McGlasson v. Barger, 163 Colo. 438, 431 P.2d 788, or if the trial court determines that it erred in resolving those questions of law which result in its submitting the case to the jury.

A. THE EXISTENCE OF A DUTY RELATIONSHIP
Mindful of these principles, we address the paramount substantive issue here which is: Under the terms of both the Architect's contract and the contractor's contract, the provisions of which applied to the Architect, did the Architect's responsibility to "supervise" construction of the building impose upon it a duty to see that reasonable precautions were taken in protecting the workmen on the site from unsafe conditions.
*391 Generally, as the Architect maintains, the duty to supervise construction creates only a duty to see that the building when constructed is in compliance with those plans and specifications contracted for. Miller v. DeWitt, 37 Ill.2d 273, 226 N.E.2d 630; Garden City Floral Co. v. Hunt, 126 Mont. 537, 255 P.2d 352; Day v. National U. S. Radiator Corp., 241 La. 288, 128 So.2d 660. See § 12-4-102, C.R.S.1973.
In our view, however, this is only a general rule of interpretation which is inapplicable here. Examination of the specific contract provisions indicates that a different intention on the part of the contracting parties could reasonably be inferred. The provisions of the contract between the school district and the Architect, as well as those contained in the agreement between the school district and the contractor, to which the Architect agrees it was bound, impose much broader and more extensive supervisory responsibilities upon the Architect.
In construing the terms of an agreement, which embraces more than one instrument, we are bound by the principle that a contract in its entirety must be enforced as written. Fuller & Co. v. Mountain States Investment Builders, Colo.App., 546 P.2d 977; Helmericks v. Hotter, 30 Colo.App. 242, 492 P.2d 85. If the language is unclear, or subject to conflicting interpretation, then the court must give effect to the intention of the parties, taking into consideration the facts and circumstances of the particular case, including the conduct of the parties. Nahring v. Denver, 174 Colo. 548, 484 P.2d 1235; Leach v. LaGuardia, 163 Colo. 225, 429 P.2d 623; Hutchinson v. Elder, 140 Colo. 379, 344 P.2d 1090.
Here, the contract between the contractor and school district provides, in relevant part:
"He [the Contractor] . . . shall designate a responsible member of his organization on the work whose duty shall be prevention of accidents. The name and position of any person so designated shall be reported to the Architect by the Contractor." (emphasis supplied).
And, a provision in the agreement between the Architect and school district reads:
"The Architects shall at all times keep proper and accurate accounts with respect to the work, which shall be available at all times to the District, complete records of all plans, specifications and drawings and changes in plans, specifications and drawings from those last approved . . ." (emphasis supplied).
The contract between the school district and the Architect required the Architect to "furnish all architectural services; engineering services . . . and supervisory services needed in connection with the planning and construction of the work". (emphasis supplied). "Work" as defined in the contract refers to the erection and construction of a new junior high school, a new high school, and remodeling of another high school. It is clear that the parties thereby intended the duty of supervision to be distinguished from, and include more than, the mere rendition of architectural services such as preparation of studies, plans, specifications and working drawings incident to the building construction. See Erhart v. Hummonds, 232 Ark. 133, 334 S.W.2d 869.

"The Architects shall supervise the construction of the work in such manner as to assure the District performance of all contracts in accordance with the terms thereof; and the Architects shall exercise due diligence so that the construction shall be strictly in accordance with the final approved plans and specifications or any authorized changes thereto, of good workmanship and of materials of the kinds specified in each instance. The Architects shall personally devote whatever time is necessary adequately to supervise, and employ at their own expense, whatever help may be necessary to fully supervise the construction of the work to the entire satisfaction of the District." (emphasis supplied).
The breadth of duties implied by such language comports with that found elsewhere in the same agreement where it is said:

*392 "This agreement is personal between the District and the Architects and is entered into because the District is to have the benefit of the personal services of the Architects whenever needed in connection with prosecution of the work. . ." (emphasis supplied).
As heretofore noted, the Architect admitted that the terms of the contract between the school district and the contractor were applicable to him. That contract reads in pertinent part:
"The Contractor shall do the work herein contemplated in strict obedience to the directions which may be given . . . by the Owner [school district] through the Architect or his representative." (emphasis supplied).
And, the same contract also reads, in part:
"The contractor shall keep on his work, during its progress, a competent superintendent and any necessary assistants, all satisfactory to the Architect. The superintendent shall not be changed except with the consent of the Architect, unless the superintendent proves to be unsatisfactory to the Contractor and ceases to be in his employ." (emphasis supplied).
Thus, the Architect's duty to supervise construction connotes a duty to assure the school district of substantial performance or execution of all contracts relating to the construction according to the terms of these contracts. The Architect was therefore bound to take reasonable steps to ensure compliance by the contractor with all of the terms of its contract with the school district. Indeed, the contractor agreed in his contract to provide any "scaffolding, ladders, etc." which the Architect required for his inspection and supervision of all work, and the subcontractors agreed to furnish shop drawings of all shoring and bracing to be used in the erection of the very wall that collapsed due to the lack thereof. The contractor likewise agreed "at all times . . [to] observe and comply with all Federal, State and local laws, codes, ordinances and regulations in any manner affecting the conduct of the work". See Geer v. Bennett, 237 So.2d 311 (Fla.App.1970); and Erhart v. Hummonds, supra, both of which discuss duties which arise under similar contract provisions.
Notwithstanding the inclusion of an indemnity provision whereby the contractor agreed to "save harmless" the school district and all of its agents, including the Architect from any liability arising from violation of any laws, the Architect was responsible for the safety of employees at the work site insofar as reasonable inspection and supervision can accomplish this purpose. This is particularly true where explicit language contained in the contract between the school district and the contractor gave authority to the Architect to stop the work whenever "such stoppage may be necessary in his reasonable opinion to ensure proper execution of the contract". For an interpretation of similar language, see Swarthout v. Beard, 33 Mich.App. 395, 190 N.W.2d 373, rev'd on other grounds, 388 Mich. 637, 202 N.W.2d 300; Miller v. DeWitt, supra. The fact that the Architect never exercised this right makes no difference, so far as the existence of a duty to provide for safe conditions is concerned.
We therefore hold that under the terms of the specific contracts here involved the Architect owed a duty to the construction workers on the site to supervise erection of the building so as to ensure that the same would be accomplished in a reasonably safe manner. Hence, we need not address the Architect's allegation that only if the Architect had control over the means and methods of construction could he be found to owe a duty of care to construction workers. See Parks v. Atkinson, 19 Ariz.App. 111, 505 P.2d 279; Reber v. Chandler High School District, 13 Ariz.App. 133, 474 P.2d 852; Nauman v. Beecher & Associates, 19 Utah 2d 101, 426 P.2d 621; Walker v. Whittenberg, Delony & Davidson, 241 Ark. 525, 412 S.W.2d 621; Day v. National U. S. Radiator Corp., supra.

B. BREACH OF DUTY
There was ample evidence, including the Architect's own testimony, to show that this particular building frame would not stand *393 erect without shoring and bracing of the columns upon which the cross-beams and then roof sections were laid. Mr. Wheeler further testified that he was well aware of a slope which had been designed and constructed for drainage purposes in that part of the roof which collapsed. Such statement when coupled with the testimony of another expert witness to the effect that such a slope put extra weight upon certain columns, could only indicate an even greater need for shoring and bracing of columns to carry the added weight.
Notwithstanding such knowledge on his part, Mr. Wheeler visited the construction site only once in the period immediately preceding the accident. He did not examine any of his employee Harbison's inspection reports before the date of the accident; and these reports do not show any reference to, or concern for, the need for shoring, despite the fact that on the day before the roof's collapse, Harbison noted that one column was obviously leaning. Furthermore, there was ample expert testimony to indicate that the absence of adequate supports could easily be seen by an inspector who, like Harbison, carried the plans and drawings while he performed his duties of inspection for the Architect. See Ferguson v. Gardner, Colo., 554 P.2d 293.
Moreover, even assuming arguendo, that none of these plans or drawings depicted the bracing, the evidence would support a jury finding that an inspector of Harbison's experience would have noticed the lack of such supports. It was well within the province of the jury not to have accepted the Architect's excuse, that he was unaware of the lack of shoring because it was within the expertise and responsibility of the subcontractor. This is particularly true since the subcontractor was required to prepare shop drawings showing all shoring and bracing detail, presumably for the Architect, and since there was ample evidence to show that the Architect's contract with the school district relative to supervision of the work was unusual and in striking contrast to a standard form for such contracts that was then in common use.
From the contract provisions and the evidence, a trier of fact could well infer, as the jury must have, that the Architect had a duty to ensure that the construction workers would labor under reasonably safe conditions at the building site. The fact that the contract required that the name of the person designated by the contractor as responsible for safety should be furnished to the Architect can only signify that if, during his inspection of the site, the Architect, or his agent, witnessed an unsafe condition which departed either from that specified in a drawing required to be approved by the Architect or from generally accepted safe practices, he would know who to contact in order to see that the situation or condition was corrected. Thus, some measure of responsibility for safety of the workmen rested upon the Architect.

C. CAUSATION
It is undisputed on appeal that the cause of collapse of that portion of the roof upon which Slifer had been standing was the lack of sufficient shoring and bracing. The Architect argues, however, that the sole cause of the collapse was the subcontractor's failure to erect the necessary supports.
This contention misses the mark. No one maintains that the Architect was under any duty, contractual or otherwise, to erect the bracing itself. We conclude, however, that the Architect's extensive supervisory duties, founded in the contract and reflected in its control over construction detail, required that it be assured that the bracing and shoring needed was, in fact erected. It is a well established principle of law that more than one person may be responsible for causing injury. If one party is negligent, and such negligence is a proximate cause of injury to plaintiff, it is no defense that some third party's negligence may have also contributed to injury. See Dunham v. Kampman, Colo.App., 547 P.2d 263, aff'd, Colo., 560 P.2d 91. Hence, evidence of a clear violation by the Architect of his duty to supervise construction in a proper manner was more than sufficient for the trier of fact to find that legal causation existed.
*394 Consequently, inasmuch as competent evidence was adduced at trial from which the trier of fact could reasonably have found Wheeler & Lewis to have been negligent in the performance of its duties, and to have found that negligence to be a proximate cause of plaintiff's injuries, we reverse the judgment and remand the cause with directions to reinstate the jury verdict, and to enter judgment thereon as of the date of the jury verdict.
RULAND and BERMAN, JJ., concur.