## LEROY E. KRIEGER ET UX. *v.* J. E. GREINER COMPANY, INC. ET AL.

[No. 48, September Term, 1977.]

*Decided February 9, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Bertram M. Goldstein,* with whom were *Jacob & Goldstein* on the brief, for appellants.

*Howard G. Goldberg,* with whom were *Wm. B. Somerville* and *Smith, Somerville & Case* on the brief, for appellee J. E. Greiner Company, Inc. et al. *Francis J. Ford,* with whom were *Ford & O'Neill* on the brief, for appellee Zollman Associates, Inc. et al.

SMITH, J., delivered the opinion of the Court. LEVINE and ELDRIDGE, JJ., concur in the result and LEVINE, J., filed a concurring opinion in which ELDRIDGE, J., joins at page 70 *infra.*

We shall here hold that the contracts of the supervising engineers in this controversy have not made them responsible for construction methods and hence for safety precautions in the building of a bridge, although we shall further hold that in the light of the allegations of the declaration, an opportunity should be afforded the plaintiffs to attempt to draw a declaration which will withstand demurrer.

In *Cutlip v. Lucky Stores,* 22 Md. App. 673, 325 A. 2d 432 (1974), about which we shall have more to say later, Judge Lowe, after philosophizing for that court on the fact that "[t]he gambling instinct endemic to our former frontier society has been replaced by a quest for security with which our contemporary society is identified," referred to the fact that "injured litigants . . . seek deeper pockets from which to make themselves whole." One may suspect that this litigation was produced by a desire for "deeper pockets" to supply compensation for the injuries sustained.

Leroy E. Krieger (Krieger), one of the appellants, was injured in an accident in the construction of the bridge across the Baltimore outer harbor, now known as the Francis Scott Key Bridge (the bridge). J. E. Greiner Company, Inc. (Greiner), one of the appellees, was the engineer responsible for the design of the bridge and overall supervision of its construction. (Its corporate name has been changed but that is unimportant to this litigation.) Zollman Associates, Inc., et al. (collectively referred to as Zollman), the other appellees, were consulting engineers relative to construction of the bridge. Krieger was injured on the job on May 4, 1973. He sued Greiner and Zollman to his own use and to the use of Aetna Casualty and Surety Company (apparently the workmen's compensation insurer). In a second count Krieger and his wife (the Kriegers) sued for injury to their marital relationship.

The Kriegers appeal from the judgment for costs entered against them when a trial judge sustained a demurrer to the declaration. Because of the public importance of the issue here presented and the lack of Maryland cases on the subject, we granted certiorari prior to consideration of the appeal by the Court of Special Appeals.

For the purpose of determining whether a trial judge has erred in sustaining a demurrer without leave to amend we are required to assume the truth of all material facts which are well pleaded as well as all inferences which can reasonably be drawn from those well pleaded facts. *Zion Evang. Luth. Ch. v. St. Hwy. Adm.,* 276 Md. 630, 632, 350 A. 2d 125 (1976); *Schwartz v. Merchants Mort. Co.,* 272 Md. 305, 307-08, 322 A.

2d 544 (1974). The facts alleged in the declaration relevant to our decision here are: The State Roads Commission (the Commission) entered into a contract with Greiner in which Greiner agreed to perform certain engineering work in connection with the construction of the bridge. The Commission also entered into a contract with Zollman concerning detailed field inspection of workmanship and materials for conformance with the plans and specifications. Under Maryland Rule 326 Greiner and Zollman each demanded production of their contracts with the Commission, copies of which were duly filed. Thus, the contracts are to "be treated as if incorporated in the pleading."

The declaration alleged that Greiner covenanted in its contract to " '[p]lan, direct and coordinate construction layout surveys, detailed field inspection of workmanship and materials for conformance with the plans and specifications' "; to " '[f]urnish such periodic and special reports as shall be deemed advisable as may be required by the Commission' "; and to " '[p]erform the services stipulated to be performed by the Consultant during the construction phase of the project,' " including " '[p]reparation of progress reports and statements [, a]pproval of all construction plans and specifications [, and c]ertification of the final completion of the project.' " It referred specifically to Greiner's obligation to " '[o]bserve and comply with all Federal, State, and local laws or ordinances that affect those employed or engaged by him on the project ... or the conduct of the work ....' " We shall have more to say later about this "obligation." The declaration said that under the contract Greiner was to "be responsible for all damage to life and property due to its activities or those of its agents or employees in connection with the services required under the contract."

The declaration said as to Zollman that under its agreement to provide " '[a]ll detailed construction, engineering and inspection of workmanship and materials for the entire bridge project, including the approach, girder spans and the three span through truss unit,' " it was to supply " '[r]esident inspection of workmanship and materials incorporated in the

construction of the entire bridge project, including the furnishing of a staff of engineers and inspectors capable of performing all normal on-site inspection of materials furnished and workmanship by the construction contractors to insure compliance with the requirements of the plans and specifications.' " The Kriegers pointed to an agreement similar to that of Greiner relative to observance and compliance with laws and ordinances and responsibility for damage to life and property.

Several corporations combined as the general contractor. Under their agreement with the Commission they were to construct the bridge under the day to day supervision and inspection of Greiner.[1] The general contractor in turn entered into a subcontract with Bildot Steel Corp. (Bildot) relative to the erection of the steel reinforcing in the concrete piers and columns at one end of the bridge. Bildot was engaged in the placement of iron reinforcement bars at the time of Krieger's injury. The Kriegers alleged that Bildot "performed its work under the continuous and uninterrupted supervision and inspection of ... Greiner ... and [Zollman], and numerous of their agents, servants and employees," who "either saw or had reason to have seen that ... Bildot ... was performing its work in a defective and ultra-dangerous manner, in that [it] erected, in a vertical position, upon each of several bases or footers of columns, forty reinforcing bars, which were approximately fifty feet long and weighed approximately 780 pounds apiece, without properly securing said steel so that it would not topple over, either by welding the reinforcing bars into place or properly stabilizing the erection with guy cables." It was said that this was a "defective and ultra-dangerous condition" which directly resulted in the

---

1. The agreement of the Commission with the general contractor has been printed by the parties as a part of the joint record extract. It does not appear in the record of the trial court. We said in Lang v. Catterton, 267 Md. 268, 274, 297 A. 2d 735 (1972), "It is elementary that this Court does not consider any matter not in the record certified to it by the lower court from whence it comes." Thus, we shall give no consideration to any portions of that contract not set forth in the declaration. Also, we shall direct in the mandate that the cost of printing that contract in the *joint* record extract be divided equally between the appellants and the appellees regardless of the ultimate outcome of the case, it being presumed from the fact that this is a joint record extract that they were jointly responsible for this impropriety.

injuries to Krieger. The Kriegers claimed that the "injuries and damages . . . were caused solely by the negligence and want of care of the Defendants, . . . Greiner . . . and [Zollman], and their agents, servants, and employees . . . ." Reasons assigned are: that Greiner and Zollman "were under a duty to exercise such reasonable care, technical skill, and ability and diligence, as is ordinarily required of engineers in the course of their plans, inspections, and supervision during the construction, for the protection of any person who foreseeably and with reasonable certainty might be injured by their failure to exercise such care." It was alleged that Greiner and Zollman "assumed said duty of care by their contract with the . . . Commission, wherein they duly covenanted not only to see that the bridge conformed to contract specifications, but they also agreed to control the day to day methods and procedures utilized by the contractors in doing the work," specifying that each of them "expressly agreed to see that the method of the construction work conformed to all Federal, State, and local laws and ordinances"; agreed "to maintain a staff of engineers and inspectors continuously on the job at all times"; that they "did, in fact, maintain such a corps of engineers and inspectors on the job at all times and said persons maintained a constant vigil over the progress and course of the work"; that these "inspectors and engineers had exercised their right to stop the work on numerous other occasions when said work either did not conform to the plans and specifications or was being performed in a negligent and dangerous manner which was unsafe for the workmen employed on the project"; that the contract between the Commission and the general contractor, "which was duly approved for execution by . . . Greiner . . . reserved the right of the Defendant engineers to reject any work and order the work to be performed anew in the event it was not performed to the satisfaction of the engineers"; that Greiner and Zollman "expressly agreed, by their respective contracts to be responsible for all damage to life and property due to their activities or those of their agents or employees"; and that the Commission, "acting on behalf of the State of Maryland, required the Defendants to supervise the work as aforesaid in order to insure the safety

of the public in general and the workmen on the job." It was further alleged that Greiner and Zollman "knew or had reason to know" as early as the day prior to the accident in question that Bildot was erecting the iron reinforcing bars in question "in a dangerous and unsafe manner," claiming that an inspector "actually saw that said reinforcing bars were improperly supported, in that only six of thirty-two reinforcing bars which had been erected upon the concrete footers, had been welded into place, and [Greiner and Zollman], as professional engineers, had the skill and expertise to appreciate that only six to eight reinforcing bars could safely be stood on end without being welded into place, and that the safe and proper manner of erection was to erect only between six to eight reinforcing bars at a time, and weld those so erected before continuing to erect more." It was also claimed that Greiner and Zollman as early as May 3 knew or had reason to know "that the column of steel which ultimately collapsed was improperly supported with guy wire, as No. 9 wire was used for support and such wire is too thin and fragile to support a structure consisting of thirty-two reinforcing bars, each weighing approximately 780 pounds." The Kriegers alleged that this latter action was in direct contravention of a federal regulation of which it was said Greiner and Zollman knew or should have known. It was further stated that once having knowledge of these conditions they had a duty to stop the work until the unsafe condition had been remedied and a further duty to point out to Bildot such conditions, but in each instance they failed to do so.

## 1. The law

For there to be liability here on the part of Greiner and Zollman, they must have breached a duty which they owed to Krieger. In the facts of this case such duty must arise either under the respective contracts of Greiner and Zollman with the Commission, or by virtue of some assumption of responsibility by the engineers by their conduct. The declaration contains no allegation of a duty imposed upon them by law other than the contractual duties to which reference has been made. It is elementary that for there to

be liability on the part of these engineers such liability would have to arise by virtue of a duty under contract, conduct, or law.

Our research has revealed but three Maryland cases which even remotely touch upon the problem presented in this case. The most recent is *Cutlip v. Lucky Stores,* 22 Md. App. 673, to which we have already referred. In that case the Court of Special Appeals found it unnecessary "to decide whether the professional responsibility of an architect of public buildings ... extend[s] to the public, or more particularly ... to the builder's employees obviously exposed to the results of his neglect," because it found the architect's "contract with the county to assume additional supervisory responsibilities clearly subjected him to a duty which encompassed the decedent." The architect there had made a contractual guarantee that a building permit would be issued. In order to obtain that permit he was required to provide Prince George's County with certain field inspections and reports. The court found "that the supervisory authority given [the architect] under his contract when coupled with his inspection and notice commitments to the County, were sufficient to allow him to perceive the danger implicit in neglectful construction, at the very least to an employee in the hazardous field of structural steel erection, if indeed not to the public for whose use the structure was intended." *Id.* at 695.

*State v. City of Baltimore,* 199 Md. 289, 86 A. 2d 618 (1952), presents an analogous situation, although it was not a suit against an engineer. There the Court noted "that an owner may be liable to the employees of an independent contractor for injuries arising out of the abnormally dangerous condition of the premises" but pointed out that in that case "the injury was not due to the condition of the premises or any defect in the equipment." Judge Henderson said for the Court:

> "The City also retained the right to inspect the work and to pass upon the safety, efficiency and adequacy of methods or appliances for securing the safety of workmen. Nevertheless, the control retained did not

constitute the City a guarantor against negligence on the part of [the employee's] fellow servants. The power retained by the City was obviously for the purpose of securing strict compliance with the terms of the contract and all proper safety precautions, not to direct the employees of the contractor in details of the work." *Id.* at 296-97.

The third case is that of *Otis Elevator Co. v. Embert,* 198 Md. 585, 84 A. 2d 876 (1951), where an individual sued the owner of a building for injuries sustained in a passenger elevator. The owner impleaded Otis Elevator Company as a third party defendant, claiming that it was liable to the owner for breach of a contract to furnish maintenance on the elevator in question. The case was tried on its merits. Judge Markell said for the Court relative to the liability of Otis:

"The scope of Otis's undertaking does not depend upon the terms of its contract with the building company, though the contract is the first place to look for what it did undertake. It might, however, have actually undertaken more than its contract obligated it to do." *Id.* at 600.

The Court held, however, "There is no evidence that Otis actually undertook more than it contracted to undertake."

There is a decided split of authority as to whether an architect or engineer responsible for day to day supervision of a construction project is liable to a workman for unsafe working conditions or liable to others for yet other shortcomings of a contractor. *See* Annot., 59 A.L.R.3d 869 (1974); Hoeveler, *Architects, Engineers & Insurance Agents Professional Liability,* 1966 ABA Section on Ins., N. & C.L. 222 (1966); Allen, *Liabilities of Architects and Engineers to Third Parties,* 22 Ark. L. Rev. 454 (1968); Witherspoon, *Architects' and Engineers' Tort Liability,* 16 Defense L.J. 409 (1967); Miller, *The Liability of the Architect in his Supervisory Function,* 1 Forum 28 (Jan. 1966); Goodin, *Architects and Malpractice,* 34 Ins. Counsel J. 290 (1967); and Gilian, *Liability of Architects and Engineers,* 35 Tenn. L. Rev. 9 (1967).

Although there is no clear majority view, it would appear that the weight of authority is on the side of nonliability.

### a. Cases imposing liability

Cases where liability was imposed fall into one of two categories: (1) cases where there were contractual provisions by the terms of which an architect or engineer might be said to be liable, or (2) in the words of the court in *Reber v. Chandler High School District # 202,* 13 Ariz. App. 133, 474 P. 2d 852, 854-55 (1970), referring to *Miller v. DeWitt,* 37 Ill. 2d 273, 226 N.E.2d 630 (1967), and other named cases "from other jurisdictions relied upon by plaintiffs" in the litigation before the Arizona court, cases where the courts "have disregarded fundamental contractual principles in attempting to parlay general inspection or supervision clauses which give the owner or architect a *right* to stop observed unsafe construction processes into a *duty* which is neither consistent with generally accepted usage nor contemplated by the contract or the parties." (Emphasis in original.)

The leading case for imposing liability on a supervising architect is *Miller v. DeWitt, supra.* The court there "agree[d] with the architects that they had no duty to specify the method the contractor would use in shoring, but . . . believe[d] that under the terms of [the] contracts [between the architect and the owner, and between the owner and the general contractor] the architects had the right to insist upon a safe and adequate use of that method." A strong dissent was filed in *Miller* in which another justice joined. They pointed out that the majority conceded that architects had no duty to specify the method used to accomplish the finished building but expressed a belief "that the architects 'had the right' to insist upon a safe and adequate use of that method." The dissent said that "to parlay that 'right' into a duty is neither consistent with generally accepted usage nor contemplated by the contract." In the later case of *McGovern v. Standish,* 65 Ill. 2d 54, 68, 357 N.E.2d 1134 (1976), that court said it "d[id] not read *Miller* as holding that the right to stop the work, without more, is conclusive in resolving the question of whether a person has charge of the work within the

meaning of the [Illinois Structural Work] Act." It referred to the architect's contractual "right to supervise the work" but said, citing *Miller,* that this "merely creates a duty to see that the building when constructed meets the plans and specifications contracted for." It concluded:

> "Were the defendant to be held in charge of the work on these facts, he would in essence be subjected to liability as a result of his status as a supervising architect alone. In our view, the imposition of such an onerous burden is neither in keeping with, nor required by, the salutary purpose underlying the Act." *Id.* at 70, 357 N.E.2d at 1142.

In *Associated Engineers, Inc. v. Job,* 370 F. 2d 633 (8th Cir. 1966), Judge Blackmun said for the court that the contract between the engineer and the owner required the engineer, among other things, "to see that construction was 'expeditious and economical,' " and "it was to supervise the 'manner' in which materials were incorporated." Moreover, the contract between the owner and the general contractor required the general contractor "to ... tak[e] ... 'all reasonable' safety precautions" and "to [refrain] from causing employees to work on energized lines or on poles carrying such lines," specifying that the engineer "was authorized to suspend the work in whole or in part in the event [the contractor] failed to comply with any provisions of the contract and to require the contractor to 'correct' violations of the section prescribing reasonable safety precautions." At page 645 the court further said that it was "not, as [the engineer] suggest[ed] converting every supervising engineer into a safety engineer as a matter of law," but that it was "simply construing a contract."

Other cases factually analogous to the question of liability of an architect or engineer, or cases placing liability on an architect or engineer include: *Summers v. Crown Construction Company,* 453 F. 2d 998 (4th Cir. 1972) (General contractor held liable to employee.); *Erhart v. Hummonds,* 232 Ark. 133, 334 S.W.2d 869 (1960) (Where the contractor was required to erect such protection as might be required

or directed by the architect, and the architect was authorized to stop the work, the court held it was a jury question as to whether the architect was negligent in failing to stop construction because of poor shoring.); *Geer v. Bennett,* 237 So. 2d 311 (Fla. App. 1970); *Swarthout v. Beard,* 33 Mich. App. 395, 190 N.W.2d 373 (1971), *rev'd on other grounds,* 388 Mich. 637, 202 N.W.2d 300 (1972) (An architect was held liable for death resulting from a cave-in where he admitted that one of the provisions of the construction contract was that an excavation was to be maintained in a safe condition and that he had the right to stop the job if he deemed it necessary to enforce safety requirements.); *Simon v. Omaha P. P. Dist.,* 189 Neb. 183, 202 N.W.2d 157 (1972) (Supervising engineers held liable where the contract between the engineer and the owner required the engineer to do the "necessary checking ... to protect the [owner's] interest in safety ...."); *Amant v. Pacific Power & Light Co.,* 10 Wash. App. 785, 520 P. 2d 181 (1974), *aff'd,* 84 Wash. 2d 872, 529 P. 2d 829 (1975) (Construction contract provided that the methods and equipment used in fulfilling the contract were to have the approval of the engineer. Therefore, trial court erred in entering summary judgment in favor of an engineer.); and *Loyland v. Stone & Webster Eng'r,* 9 Wash. App. 682, 514 P. 2d 184 (1973) (Engineer held liable where a concrete form broke and the construction contract provided, "The type, ... quality and strength of all materials of which the forms are made shall be subject to the approval of the Engineers.").

### b. Cases denying liability

Probably the leading case holding an engineer not liable is that of *Day v. National U.S. Radiator Corporation,* 241 La. 288, 128 So. 2d 660 (1961), where an employee of a subcontractor installing a hot water system was fatally injured as a result of a boiler explosion. His widow obtained a judgment against the architects. The Louisiana Supreme Court reversed. The architects, under their contract with the owner, were to provide, among other things, "supervision of the work" as indicated by a schedule set forth in the contract. This included "adequate supervision of the execution of the

work to reasonably insure strict conformity with the working drawings, specifications, and other contract documents." The supervision was to include "frequent visits to the work site . . . ." The architects employed engineers upon whom they relied relative to the mechanical and electrical work. The court said a plain provision of the specifications was "that the hot water heater or boiler should be equipped with a thermostat and with a temperature and pressure relief valve." The subcontractor installed the boiler without such a valve. He placed the thermostat and valve on a hot water storage tank. When the subcontractor caused the boiler to be lighted for preliminary testing, an explosion ensued, resulting in the death of the employee. The subcontractor had not informed either the architects or the engineers that the system was ready for inspection. In determining "that under the contract . . . the architects were [not] charged with the duty or obligation to inspect the methods employed by the contractor or the subcontractor in fulfilling the contract or the subcontract," the court said:

"As we view the matter, the primary object of this provision was to impose the duty or obligation on the architects to insure to the owner that before final acceptance of the work the building would be completed in accordance with the plans and specifications; and to insure this result the architects were to make 'frequent visits to the work site' during the progress of the work. Under the contract they as architects had no duty to supervise the contractor's method of doing the work. In fact, as architects they had no power or control over the contractor's method of performing his contract, unless such power was provided for in the specifications. Their duty to the owner was to see that before final acceptance of the work the plans and specifications had been complied with, that proper materials had been used, and generally that the owner secured the building it had contracted for." *Id.* at 304-05, 128 So. 2d at 666.

Other cases holding engineers or architects not liable include: *Baker v. Pidgeon Thomas Company,* 422 F. 2d 744 (6th Cir. 1970) (Court found no liability because "there [was] nothing in [the engineer's] contract with the owner that imposed a duty to ascertain whether all the subcontractors were conforming to their contracts with the owner, except to the extent those contracts required conformity with design specifications." There was no authority given "to stop work for safety reasons as they could when they detected deviations from specifications."); *C. W. Regan, Inc. v. Parsons, Brinckerhoff, Quade & Douglas,* 411 F. 2d 1379 (4th Cir. 1969) (The court referred, among other cases, to *Ramos v. Shumavon,* 21 A.D.2d 4, 247 N.Y.S.2d 699, *aff'd without opinion,* 15 N.Y.2d 610, 255 N.Y.S.2d 658, 203 N.E.2d 912 (1964), and the statement of the court there that it was "simply construing a contract." The Fourth Circuit held that a directed verdict should have been entered on behalf of the engineers, observing that the duty of an engineer "to obtain for the owner a tunnel according to plans and specifications d[id] not carry with it a duty to see to it that one contractor's negligence d[id] not damage the property of another contractor, and d[id] not create a continuing duty of inspection as to temporary details of construction of temporary structures."); *Heslep v. Forrest & Cotton et al.,* 247 Ark. 1066, 449 S.W.2d 181 (1970) ("The engineers' rights and powers are not to be confused with their obligations and duties under their contracts." The engineers "were not charged with the duty of enforcing the [safety] code and were not charged with negligence as a matter of law in the employer's failure to comply with the code."); *Walker v. Wittenberg,* 242 Ark. 97, 412 S.W.2d 621 (1967) (The court stated "that the correct rule covering the circumstances [t]here prevailing was stated in *Day . . . .*"); *Reber,* 13 Ariz. App. 133, 474 P. 2d at 854-55 ("The dissenting opinion in *Miller* . . . constitutes a concise, well reasoned statement of the controlling legal principles, and is consonant with the Arizona decisions . . . ."); *Jackson v. Sergent, Hauskins & Beckwith Engineers, Inc.,* 20 Ariz. App. 330, 512 P. 2d 862 (1973); *Parks v. Atkinson,* 19 Ariz. App. 111, 505 P. 2d 279 (1973); *Seeney*

v. *Dover Country Club Apartments, Inc.,* 318 A. 2d 619, 624
(Del. Super. 1974); *Walters v. Kellam & Foley,* 360 N.E.2d 199,
211 (Ind. App. 1977); *Brown v. Gamble Const. Co., Inc.,* 537
S.W.2d 685 (Mo. App. 1976) (The court said architects were
"under no duty to supervise construction unless they
expressly agreed to do so," and since the contractor agreed
to "be responsible for . . . supervising all safety precautions"
and agreed with the subcontractor to "*supervise* all work with
regard to [its] individual as well as total job requirements,"
the architect was "relieved of any such duty." (Emphasis
added by the court.)); *Wells v. Thill,* 153 Mont. 28, 452 P. 2d
1015 (1969) (Plans and specifications provided for shoring
when necessary and that safety precautions should be taken
to assure the safety of employees working on the project. The
court found "no duty on the part of the engineer to see that
standards set up by the Montana Industrial Accident Board
were met," stating:

> "On the other hand, the duty of the engineer,
> which duty ran to the city, was to see that a certain
> end result was eventually accomplished, namely that
> the project as finally constructed and turned over to
> the city met the plans and specifications it prepared
> for the city. The engineer's real interest was not in
> the actual construction but in a completed project in
> accordance with the plans and specifications." *Id.* at
> 34-35, 452 P. 2d at 1018.);

*Nauman v. Harold K. Beecher and Associates,* 24 Utah 2d
172, 467 P. 2d 610 (1970) (The court found insufficient
evidence to render an architect liable. In the course of that
opinion, however, the court observed:

> "It would be outside the bounds of reasonable care
> to require the architect to scrutinize each act done
> by the foreman and fifty-eight other workmen over
> an eleven acre construction site to make certain that
> none of them did a potentially dangerous act." *Id.* at
> 178-79, 467 P. 2d at 614-15.);

*Peterson v. Fowler,* 27 Utah 2d 159, 493 P. 2d 997 (1972) (The
court found no liability on the part of an architect for the

death of an employee of a general contractor resulting from the collapse of a scaffolding when the architect "neither designed it, constructed it, nor designated any material for it, nor did he have anything to do with renting or maintaining it," adding that the architect "owed no duty to the subcontractors or their employees in connection with that scaffolding [, h]is responsibility [being] to his client, the owner of the building, and his duty in that regard was to see that the sports arena was properly erected so that it would be safe for the uses to which it would be put when finished."); and *Vonasek v. Hirsch and Stevens, Inc.*, 65 Wis. 2d 1, 221 N.W.2d 815 (1974) (When a contractor sued an engineer for economic loss occasioned by the collapse of steel supports of a roof, the court held that:

> "The mere fact that defendant in this case was continuously represented on the site by Halverson cannot, as is suggested by plaintiff, alter the lack of a legal duty to interfere with the contractor's judgment as to procedure, absent a showing that the risks were so unusual as to be beyond the ability of the contractor to perceive, given his special knowledge and experience." *Id.* at 12, 221 N.W.2d at 820.).

*Ramos v. Shumavon*, 21 A.D.2d 4, 247 N.Y.S.2d 699, *aff'd without opinion*, 15 N.Y.2d 610, 255 N.Y.S.2d 658, 203 N.E.2d 912 (1964), presented a situation somewhat analogous to the case at bar. There engineers were retained by the State of New York in connection with the construction of an expressway. Forms collapsed and injuries and deaths resulted. The court said that the only bases "upon which liability m[ight] be bottomed [were] alleged acts of omission — the failure to inspect, advise or take other steps to insure that the forms were properly erected and the men working therein properly safeguarded." It observed that to sustain the position of the plaintiffs it "must find in the contracts not only a clear obligation on the part of the defendants to perform in the area in question, but [it] must also find an intention that for a breach of such obligation the defendants [were] to be

liable to the workmen on the job." The contract required the employer "by working methods and orders of procedure subject to the approval of the Engineer, [to] conduct the work in the most expeditious manner possible, having due regard for the safety of persons and property and safety for traffic," which it was contended created a duty in favor of workmen on the job. The court found that this provision "was designed to protect members of the public at large — not the workmen on the job." It said:

> "The plaintiffs point to no other provisions of the 'contract documents' — nor do we find any — as could be said to impose an obligation upon the defendants to insure the safety of the workmen. As we read the pertinent documents the defendants were hired, in effect, to see to it that the State obtained the end product it bargained for — a properly constructed portion of the expressway. There being no contractual duty regarding the safety of the workmen the judgment against these defendants may not stand and the complaint must be dismissed." *Id.* at 8, 247 N.Y.S.2d at 703.

*See also Olsen v. Chase Manhattan Bank,* 10 A.D.2d 539, 205 N.Y.S.2d 60 (1960), *aff'd,* 9 N.Y.2d 829, 175 N.E.2d 350 (1961).

### 2. This case

The Kriegers in their attempt to recover here have proceeded upon three theories, (1) that under the contracts between the Commission and Greiner and Zollman these engineers are responsible for supervision of the methods of construction, and hence are responsible for safety; (2) that the engineers under their contracts with the Commission are specifically responsible for safety; and (3) that, aside from the contracts, the engineers have assumed responsibility for safety.[2]

---

2. Although some of the cases holding architects or engineers liable in safety matters have done so upon the basis of the construction contract between the owner and the general contractor, it will be noted that the declaration in this case contains no allegation as to a duty imposed under the construction contract except for the implication we discuss under "Assumed responsibilities," *infra.*

### a. The contracts with the engineers

The principles relative to construction of contracts are well known and have been enunciated by this Court numerous times: the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or intended it to mean; where a contract is plain and unambiguous, there is no room for construction, and it must be presumed that the parties meant what they expressed; and when the language of a contract is clear, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. *Board of Trustees v. Sherman,* 280 Md. 373, 380, 373 A. 2d 626 (1977); *Billmyre v. Sacred Heart Hosp.,* 273 Md. 638, 642, 331 A. 2d 313 (1975), and cases there cited.

It will be recalled that in the declaration the Kriegers alleged that Greiner and Zollman each "expressly agreed to see that the method of the construction work conformed to all Federal, State, and local laws and ordinances." The provision of the Greiner contract from which this is derived states:

"V. GENERAL CONDITIONS

"1. *General Compliance with Laws*

The Consultant will observe and comply with all Federal, State and Local Laws or Ordinances that affect those employed or engaged by him on the Project, or the materials or equipment used, or the conduct of the work, and will procure all necessary licenses, permits and insurance."

There also is an allegation in the declaration that Greiner and Zollman "expressly agreed, by their respective contracts to be responsible for all damage to life and property due to their activities or those of their agents or employees." The relevant portion of the Greiner contract on this subject appears in the

next succeeding paragraph to that which we have just quoted. It states:

"2. *Responsibility for Claims and Liability*

The Consultant will be responsible for all damage to life and property due to his activities or those of his agents or employees, in connection with the services required under this Agreement and will be responsible for all parts of his work, both temporary and permanent, until the services under this Agreement are declared accepted by the Commission, it being expressly understood that the Consultant will indemnify and save harmless the Commission, its members, officers, agents, and employees of, from and against all claims, suits, judgments, expense, actions, damages, and costs of every name and description, arising out of or resulting from the services of the Consultant under this Agreement."

The contract then contains a covenant against contingent fees, and goes on to provide for termination, ownership of documents, and the like. The contract with Zollman contained identical provisions under "General Conditions." To us it is obvious that this language does not attempt in any manner to place upon the engineers a duty to see that the contractors obey all laws in connection with the work. It is simply an agreement on the part of the engineers that insofar as the work *they* perform on behalf of the Commission is concerned they will comply with such laws. Likewise, this quoted language does not purport to hold the engineers responsible for life and property generally in connection with the construction of the bridge. It is an agreement on the part of the engineers that as to the work *they* perform they will be responsible for damage to life and property.

Aside from the two paragraphs of the contract which we have just quoted, obviously taken out of context in the declaration, the recitals of contract provisions in the narr. are substantially correct.

We have carefully examined each of the contracts in question. We find no provisions in these contracts imposing any duty on the engineers to supervise the *methods* of construction. Some mathematics instructors have been heard to observe that there is more than one solution to a given problem and thus they are unable to say that any given method of solving a problem is the only correct solution, being able only to determine that the correct answer is produced. The same reasoning would apply to methods of construction. One skilled contractor may prefer one method for performing a given task while another such contractor may choose what seems to him a simpler, less expensive way of reaching the same end result, either of which procedures would be a proper method. It could well be, however, that one method might not have occurred to an engineer or another contractor.

We likewise find nothing in the contracts imposing any duty on the engineers to supervise safety in connection with construction.

The duty of the engineers under their contracts is to assure a certain end result, a completed bridge which complies with the plans and specifications previously prepared by Greiner. It will be observed that many of the cases which have held architects and engineers responsible for safety have done so upon the basis of the construction by the courts of the contracts existing between the engineer or architect and the owner. We hold that a fair interpretation of the contracts between the Commission and Greiner and Zollman is that the duties of those engineers do not include supervision of construction methods or supervision of work for compliance with safety laws and regulations. Hence, the Kriegers may not recover from the engineers under the contracts between the owner and its engineers.

### b. Assumed responsibilities

Our determination relative to the contractual provisions does not end the matter, however, because in their declaration the Kriegers alleged that Greiner and Zollman had "inspectors and engineers [on the job who] had exercised their right to stop the work on numerous other occasions when said

work . . . was being performed in a negligent and dangerous manner which was unsafe for the workmen employed on the project" and that the Commission "required [Greiner and Zollman] to supervise the work as aforesaid in order to insure the safety of . . . the workmen on the job." These alleged facts, if true, might provide a basis for recovery. The declaration, however, refers only to the two contracts with the Commission discussed above, which are treated here under Rule 326 "as if incorporated in the pleading." As we have shown, those contracts negate the allegation that the Commission required the engineers to supervise the work for safety. However, the Kriegers should have an opportunity to amend their declaration to allege — if they have a proper foundation for such an allegation — some other possible hypothesis for recovery, such as an amendment of the contract between the engineers and the Commission, or a separate, supplemental agreement between them.

> *Judgment reversed and case remanded for further proceedings consistent with this opinion; costs to abide the final result except that the cost of printing the contract between the State Highway Administration on the one part and the Balf Co. et al. on the other part, beginning on page E60 of the joint record extract and continuing through page E71, shall be divided equally between the appellants and the appellees regardless of the final outcome.*

*Levine, J., concurring* :

While I agree that the judgment of the trial court sustaining appellees' demurrer must be reversed, it is my opinion that the declaration, as currently drawn and without the need for any further amendment, sets forth facts sufficient to establish a cause of action against the

engineering firms on the theory that they voluntarily assumed and then breached a duty of care toward appellant Krieger, independent of any contractual obligations appellees may have undertaken in their agreements with the State Roads Commission.

In paragraph 19a of his declaration, Krieger alleged that appellees were under a duty to exercise reasonable care and skill in inspecting and supervising the construction of the Francis Scott Key Bridge for the protection of persons who might foreseeably be injured by appellees' failure to exercise such care. Appellant then goes on to allege in paragraph 19b that appellees:

> "[A]ssumed said duty of care by their contract with the State Roads Commission, wherein they duly covenanted not only to see that the bridge conformed to contract specifications, but they also agreed to control the day to day methods and procedures utilized by contractors in doing the work in that:
>
> * * *
>
> "4.) [Appellees] had exercised their right to stop the work on numerous other occasions when said work ... was being performed in a negligent and dangerous manner which was unsafe for the workmen employed on the project."

The majority apparently interprets the quoted portion to mean that the voluntary acts of appellees were carried out pursuant to their contracts with the Roads Commission under which the engineering firms clearly had no duty to supervise the contractors' methods.[1] Read literally, the declaration would appear to support the majority's view. On closer scrutiny, however, it is quite obvious that the allegations concerning appellees' previous conduct in stopping work for the safety of workmen were not based on any contractually assumed duty. Rather such allegations relate to events which

---

1. *But see Slifer v. Wheeler & Lewis,* Colo. App., 567 P. 2d 388, 392 (1977), *cert. granted,* (holding that architect owed duty of care to construction workers at job site under contract provisions very similar to those involved in the instant case).

transpired *after* the contracts had been executed and performance actually begun.

Assuming, as we must, the truth of all well pleaded facts and all inferences which can reasonably be drawn therefrom, *Zion Evang. Luth. Ch. v. St. Hwy. Adm.,* 276 Md. 630, 632, 350 A. 2d 125 (1976); *Citizens P. & H. Ass'n v. County Exec.,* 273 Md. 333, 337-38, 329 A. 2d 681 (1974), I can only read paragraph 19 to mean that appellees, for whatever reason, unilaterally took it upon themselves on numerous occasions to halt construction on the bridge in order to protect workmen on the job site. It is settled tort law that once a person gratuitously embarks upon a course of conduct intended to protect another person or class of persons whom he was under no preexisting legal duty to protect, he must conduct himself in a reasonable and prudent fashion; and his failure to do so will subject him to liability for damages if injury proximately results. *Hoover v. Williamson,* 236 Md. 250, 253-54, 203 A. 2d 861, 10 A.L.R.3d 1064 (1964); *Penna. R.R. Co. v. Yingling,* 148 Md. 169, 176-77, 129 A. 36, 41 A.L.R. 398 (1925). *And see Donohue v. Maryland Casualty Company,* 248 F. Supp. 588, 592 (D. Md. 1965), *aff'd,* 363 F. 2d 442 (4th Cir. 1966) (applying Maryland law); *Coffee v. McDonnell-Douglas Corporation,* 8 Cal. 3d 551, 105 Cal. Rptr. 358, 503 P. 2d 1366, 1370 (1972); *Parvi v. City of Kingston,* 41 N.Y.2d 553, 394 N.Y.S.2d 161, 362 N.E.2d 960, 964 (1977); Restatement (Second) of Torts § 323 (1965).

Having assumed a duty of care towards Krieger, appellees then are said to have breached this duty when they failed to warn the subcontractor of the hazardous condition and failed to stop work on the column after they had either seen or should have seen that Bildot Steel Corporation had failed properly to secure and weld the steel reinforcing bars which ultimately collapsed on appellant. Surely these allegations were sufficient, if true, to make out a prima facie case for recovery against appellees.

Appellees contend that Krieger was required to allege in his declaration that Bildot had been led to rely on appellees' oversight by reason of their past acts in stopping work for job safety purposes, and that in the face of such reliance

appellees could not casually abandon their previously assumed responsibilities. Suffice it to say, that for purposes of pleading it was not necessary for appellant to allege reliance on the part of Bildot or any other person. The rule remains that whenever a person voluntarily assumes a duty of care, he must thereafter act reasonably. While reliance on the part of the victim or a third party may be relevant to the question of the reasonableness of the volunteer's conduct, it is not a necessary element of the cause of action. *Betesh v. United States,* 400 F. Supp. 238, 246 (D. D.C. 1974) (applying Maryland law); W. Prosser, *Handbook of the Law of Torts* § 56, at 347-48 (4th ed. 1971). *Contra, Chisolm v. Stephens,* 47 Ill. App.3d 999, 7 Ill. Dec. 795, 365 N.E.2d 80, 86 (1977).

Accordingly, on remand I would not require appellees to amend their declaration in order to state a cause of action for breach of a voluntarily assumed duty of care. Judge Eldridge authorizes me to state that he joins this opinion.